UNITED STATES of America and the State of New York, Plaintiffs,

v.

HOOKER CHEMICALS AND PLASTICS CORPORATION, Hooker Chemical Corporation, Occidental Petroleum Investment Corporation, and Occidental Petroleum Corporation (Hyde Park Landfill), Defendants.

No. CIV–79–989C.

United States District Court, W. D. New York.

April 30, 1982.

---

Roger P. Williams, U. S. Atty., Buffalo, N.Y. (Jack S. Penca, Buffalo, N.Y., of counsel), U.S. Dept. of Justice, Environmental Enforcement Section (Michael Elder, Washington, D.C., of counsel), U.S. Dept. of Justice, Land and Natural Resources Div. (Carol Dinkins, Asst. U.S. Atty. Gen., Washington, D.C., for Lands, of counsel), U.S. Environmental Protection Agency, Office of Waste Programs Enforcement (William J. Walsh, Washington, D.C., of counsel), for plaintiff United States.

Robert Abrams, Atty. Gen., State of N.Y. (Marcia J. Cleveland, Lorelei Joy Borland, and Mary Ellen Burns, Asst. Attys. Gen., New York City, of counsel), for plaintiff State of N.Y.

Wald, Harkrader & Ross, Washington, D.C. (Thomas H. Truitt, Washington, D.C., of counsel), Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, N.Y. (David K. Floyd, Buffalo, N.Y., of counsel), Phillips, Nizer, Benjamin, Krim & Ballon, New York City, (Louis Nizer, and George Berger, New York City, of counsel), for defendant Hooker.

Robert Paul Merino, Niagara Falls, N.Y., for defendant Town of Niagara.

Edward P. Jesella, Jr., Lewiston, N.Y., for defendant Town of Lewiston.

Jay, Klaif & Morrison, Buffalo, N.Y. (Barbara Morrison, Buffalo, N.Y., of counsel), for amicus Ecumenical Task Force.

Canadian Environmental Law Association (Toby Vigod, Toronto, Ontario, of counsel), for amicus Pollution Probe and Operation Clean-Niagara.

Grossman, Levine & Civiletto, Niagara Falls, N.Y. (Richard Berger, Niagara Falls, N.Y. of counsel), for proposed intervenor Martelli.

Lewis Steele, Niagara Falls, N.Y. and Robert J. Sugarman, Philadelphia, Pa., for proposed intervenors College Heights Property Owners Ass'n and Niagara County Citizens Alliance.

CURTIN, Chief Judge.

*I. Introduction*

This is an environmental lawsuit filed by the United States Environmental Protection Agency in December 1979 against the defendant, Hooker Chemical and Plastics Corporation [Hooker].[1] A settlement agreement and a proposed judgment approving the settlement was lodged with the Clerk of the Court on January 19, 1981. At this time, the court must decide whether the agreement should be approved.

*II. The Landfill Site*

The Hyde Park Landfill occupies approximately 15 acres in the northwest corner of the Town of Niagara, New York. It is surrounded primarily by industrial property, including the Niagara Steel Company to the west and the Tam Ceramic Company directly south. It is bounded on the north side by Greif Brothers, Inc., and beyond

---

1. Defendants include Hooker Chemical & Plastics Corporation, Oxy Chemical Corporation, Hooker Chemical Corporation, Occidental Petroleum Investment Company, Occidental Petroleum Corporation, and the Towns of Lewiston and Niagara, New York. Although others of the defendants have responsibilities under the settlement agreement, Hooker Chemical & Plastics Corporation is the entity primarily responsible for the Hyde Park Landfill. The term "Hooker" shall refer to this defendant.

that are residential homes. On the east side, the Landfill Site is surrounded by undeveloped land in the form of a right-of-way owned by the Niagara Mohawk Power Corporation.

The Hyde Park Landfill Site [the Site] is located between the Niagara River and conduits constructed by the Power Authority of the State of New York [PASNY]. It is 3,500 feet east of the Niagara River and 3,500 feet west of the conduits. Approximately 7/10 of a mile to the north of the Site is a power canal also constructed by PASNY. The PASNY conduits connect the power canal to the Niagara River at intakes which are located approximately 3½ miles from the Landfill Site. The Niagara River flows from Lake Erie to Lake Ontario in a northwesterly direction. To further locate the Site, it is approximately 3 miles from Goat Island and the Horseshoe and American Falls. (*See* Appendix A.)

Bloody Run Creek flows past the northwest corner of the Site. It flows above-ground until it reaches a road called New Road, then into a culvert beneath the road. It emerges above ground for a short distance, then flows into another culvert below the Greif Brothers Barrel Plant. Next, the Creek emerges and flows into an area near the Niagara University Campus, where it drops into an underground storm drain 20 to 30 feet below ground level. Finally, Bloody Run Creek flows west through the Niagara Gorge into the Niagara River.

Geologically, the area beneath the Site consists of several strata of soil and rock. Immediately beneath the Site, to a depth of approximately 30 feet, is a layer of glacial till soil, primarily clay, silt, and sand. Below this is a layer of rock approximately 90 to 130 feet thick, known as the Lockport Dolomite Zone. This zone consists of layers of dolomite, with limestone and shale at the bottom of the zone. Underlying this stratum is the Rochester Shale Zone, approximately 60 feet of hard shale. This is underlaid by various strata of sandstone, limestone, and shale, and finally, by an extraordinarily hard rock layer, known as the Queenston Shale Zone. (*See* Appendix B.)

For more than two decades, this 15-acre area was used as a disposal site by the defendant for waste materials and by-products from its chemical manufacturing plant in Niagara Falls. Hooker produces agricultural chemicals, fertilizers, plastics, and various industrial chemicals. While the exact contents of the Landfill are unknown at this time, an estimated 80,000 tons of chemical wastes are deposited there. This figure includes 3,300 tons of Trichlorophenol still bottoms which contain dioxin [TCDD], one of the most potent toxins.

The existence of the chemical dump site began to arouse great public concern in the early 1970s. In 1971, the Niagara County Health Department requested that Hooker cease further waste disposal at the Site and seal it off. Hooker's use continued until 1975, when the Site was closed.

In 1978, Hooker hired the engineering firm of Conestoga-Rovers & Associates of Waterloo, Ontario, Canada, to examine the Site in order to determine what, if any, remedial work should be undertaken to clean up the chemicals disposed of within the Site and to prevent the spreading (migration) of contamination. At defendant's request, the firm placed 10 observation wells which were monitored and analyzed to identify the flow of water and chemicals in the area. Next, Hooker, acting upon the experts' advice, constructed a concrete cap and a security fence. Also, in 1978–1979, Hooker installed a tile drain system around the Landfill Site. This system, which is currently in use, collects approximately 4,000 gallons of water each day from the overburden—the topsoil—around the Site. Finally, Hooker reconstructed the storage container (or lagoon) which had been placed in the southwest corner of the Site in 1974 and constructed an impermeable lagoon to hold the materials collected by the tile drain system until they could be treated. These lagoons were then covered with plastic caps. At each phase of this program, Hooker was in contact with the New York State Department of Environmental Conservation [DEC] and received approval from it regarding the protocols used for investigation,

the studies made, and the remedial work undertaken.

### III. Procedural History of the Case

These measures were deemed insufficient by plaintiff Environmental Protection Agency [EPA]. Recognizing that it was powerless to force the defendant to go beyond these voluntary measures unless the defendant was adjudged to be in violation of the law, the plaintiffs commenced four environmental lawsuits in December 1979. In this action, plaintiffs sought injunctive relief and monetary damages pursuant to section 7003 of the Resource Conservation and Recovery Act, 42 U.S.C. § 6973; and sections 309 and 504 of the Clean Water Act, 33 U.S.C. §§ 1319, 1364; section 13 of the River & Harbors Act, 33 U.S.C. § 407; and general nuisance law.

After the defendant filed an answer, the State of New York and the Towns of Lewiston and Niagara were joined as involuntary defendants. Upon application to the court, the State became a party plaintiff.

Discovery and pretrial procedures followed in the usual course until January 1981, when the parties notified the court that they had agreed upon a settlement. As noted above, the settlement agreement was filed with the court on January 19, 1981. After an initial examination of this document, the court ordered the parties to appear in order to explain the various provisions of the proposed settlement and to answer any questions. This presentation took place on February 10.

Recognizing that the resolution of these issues by agreement could have tremendous impact upon the residents of the community and, indeed, upon all of the surrounding areas, the parties conducted a public hearing at Niagara University on February 19. The transcript of that hearing has been filed with the court. Additionally, to gauge the public concerns as accurately as possible and to get the maximum input from the community, the United States agreed to respond to all comments received relative to the notice of settlement, which was published in the Federal Register from February 5 to March 20, 1981. All comments and the responses of the United States have been filed with the court and made a part of the record.

The procedural aspects of this case became further complicated when the court received a petition from the Ecumenical Task Force [ETF] by its attorney, Ms. Barbara Morrison. The ETF sought leave to intervene as *amicus curiae*. The court granted this motion and a similar motion submitted jointly by organizations known as Pollution Probe and Operation Clean-Niagara, represented by Canadian barrister Toby Vigod. In addition, the court received motions from the Niagara Falls Citizens Alliance and the College Heights Property Owners Association through their attorney, Lewis Steele, and from a property owner in the Hyde Park vicinity, Mr. Norman Martelli. These applicants seek leave to intervene in this action as parties. The court has reserved decision on these motions until this time.

The briefs and memoranda filed by the parties, by *amici*, and by the applicants for intervention subsequent to the oral presentation of February 10 were most helpful and informative. They served to convince the court, however, that many questions remained unanswered and many concerns had not been addressed during the prior hearing. Accordingly, the court issued an order listing some questions to be answered by the parties in an attempt to clarify the highly technical and complex settlement. It was further directed that another hearing be held during which the proponents of the consent decree were to respond to the issues raised by the court and by *amici*. *Amici* were given leave to participate and present witnesses. The applicants for intervention were given leave to participate as *amici*. *See* my order of August 7, 1981.

The hearings extended over eight days and produced a transcript of 2,000 pages. The terms of the settlement agreement, the objections of *amici*, and alternative solutions to this environmental crisis all were explored in detail. Testimony was taken from 15 expert witnesses. These witnesses

included top specialists from a variety of scientific fields, including chemists, geologists, and engineers. All parties, including *amici* and the applicants for intervention, fully examined and cross-examined the witnesses.

The result of this effort is a complete, fully developed record. Upon careful examination of this record and the 186 exhibits filed, as well as the briefs and memoranda of law, I am convinced that the proposed consent decree is the best possible solution to the problem under all the circumstances, and it shall be approved.

*IV.  The Standard of Review*

In reviewing this document, we must keep in mind the applicable standard of review. The proponents and *amici* are in agreement that when the parties to a lawsuit have arrived at a settlement, the court has only limited powers of review.

As has been stated by a number of courts, there is

[a] clear policy in favor of encouraging settlements ... particularly in an area where voluntary compliance by the parties over an extended period will contribute significantly toward ultimate achievement of statutory goals.

*Patterson v. Newspaper & Mail Deliverers Union of New York*, 514 F.2d 767, 771 (2d Cir. 1975), *cert. denied*, 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976); *Airline Stewards Local 550 v. American Airlines*, 573 F.2d 960 (7th Cir. 1978), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978); *Newman v. Stein*, 464 F.2d 689 (2d Cir.), *cert. denied*, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972); *Wellman v. Dickinson*, 497 F.Supp. 824 (S.D.N.Y.1980), *aff'd*, 647 F.2d 163 (2d Cir. 1981).

It is well settled that the function of the reviewing court is not to substitute its judgment for that of the parties to the decree but to assure itself that the terms of the decree are fair and adequate and are not unlawful, unreasonable, or against public policy. *See United States v. City of Jackson*, 519 F.2d 1147, 1151 (5th Cir. 1975); *West Virginia v. Chas. Pfizer & Company*, 440 F.2d 1079, 1085 (2d Cir.), *cert. denied*, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971); *Williamsburg Fair Housing v. New York City Housing*, 450 F.Supp. 602, 606 (S.D.N.Y.1978).

In the leading case of *City of Detroit v. Grinnell Corp.* 495 F.2d 448 (2d Cir. 1974), the United States Court of Appeals for the Second Circuit stated:

[t]he Court must eschew any rubber stamp approval in favor of an independent evaluation, yet, at the same time, it must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case.

*Id.* at 462. Under the reasoning of *Grinnell* and its progeny, the reviewing court has a limited duty to inquire into the technical terms and the factual disputes underlying the proposed settlement.

█ A number of courts have noted relevant factors which must be considered by the reviewing court. The most important factor is the court's determination of the strength of the plaintiffs' case. Other factors include the good faith efforts of negotiators, opinion of counsel, and the possible risks involved in litigation if the settlement is not approved. *See Plummer v. Chemical Bank*, 668 F.2d 654, 659–60 (2d Cir. 1982); *Armstrong v. Board of School Directors*, 616 F.2d 305, 314 (7th Cir. 1980); *Gautreaux v. Landrieu*, 523 F.Supp. 665, 669 (N.D.Ill.1981); *Heit v. Amrep Corp.*, 82 F.R.D. 130, 133 (S.D.N.Y.1979).

█ In addition to these general requirements, special policy considerations are present in this case. In the case of *United States v. Ketchikan Pulp Co.*, 430 F.Supp. 83 (D.Alaska 1977), an environmental lawsuit brought pursuant to the Federal Water Pollution Control Act, the court reviewed the general rules regarding the standard of review for settlement decrees and noted that "the court is asked to enter a judgment which clearly will have an affect [sic] upon the public." After a discussion of the various standards of review proposed by the parties and intervenors, the court concluded that

the appropriate standard is that the court should determine whether the decree adequately protects the public interest and is in accord with the dictates of Congress. *Id.* at 86 (citations omitted).

The court is in agreement with the above-quoted language. During this entire proceeding, the court's primary concern has been to ensure that the settlement protects public health and the environment to the greatest extent feasible under currently existing technology. Accordingly, the task has been to examine the proposal and determine whether it is a fair and adequate settlement and whether its implementation will reflect concern for the problems for which Congress has enacted the various environmental statutes.

### V. The Controversy

The basic concern which underlies this lawsuit is not the presence of the chemicals in the Landfill itself but the fact that these chemicals will migrate away from the Landfill toward the Niagara River and Lake Ontario. Given the deadly toxicity of these chemicals in even minute dosages, the specter of these wastes seeping into the Niagara River is indeed frightening.

The precise hydrogeological characteristics of the land around and beneath the Site—its ability to transmit the chemicals from the Site—are unknown. Whether migration will take place, how it will happen, the speed at which the chemicals will move, and the extent of the migration are questions of intense controversy.

At issue is the permeability of the various strata underlying the Site. Proponents and opponents alike agree that the most permeable of the layers is the top 10 to 15 feet of the Lockport Dolomite. A 1961 United States Geological Survey Report characterized this area as "the only important aquifer" in the Hyde Park area.[2] The testimony during the hearing showed that ground-water entering this formation moves in three ways: through vertical cracks or vertical joints, through horizontal openings known as bedding joints, and into small cavities which vary in size. Below 15 feet, the vertical joints tend to close, and the lower portion of the Lockport Dolomite is considered to be less permeable than the upper portion.

The proponents of the settlement agreement do not contend there is no migration taking place below the upper portion of the Lockport Dolomite, but they estimate that for the most part, migration of chemicals will occur in the top zone. In the lower Lockport Dolomite Zone, it is expected that the water will move laterally through the horizontal bedding joints due to the closing of the vertical joints.

Based upon the preliminary research conducted by the United States Geological Survey and Conestoga-Rovers and Associates, the consulting firm retained by Hooker, and upon investigations conducted by the governmental parties, the proponents theorize that with the exception of a highly fractured area close to the Niagara Falls Gorge, the Rochester Shale Zone is virtually impervious and that its importance as an aquifer is negligible.

*Amici's* position is that the groundwater in the area moves vertically downward entirely through the Lockport Dolomite and Rochester Shale Zones into the more permeable layers of limestone beneath the Rochester Shale Zone. This contention is based primarily upon tests conducted by *amici's* expert, Gartner Lee Associates, in an area across the river from the Hyde Park Landfill near the Welland Canal in Canada. *Amici* rely also upon the United States Geological Survey Report (*supra* at p. 1073).

### VI. The Settlement Agreement

The settlement decree prescribes a phased approach for remediation. Wisely, the parties have chosen to proceed cautiously. The

---

2. *Ground Water in the Niagara Falls Area, New York, With Emphasis on the Water-Bearing Characteristics of the Bedrock*, Bulletin GW–53 (1964), published by the State of New York Conservation Department, Water Resources Division.

The term "aquifer," when used in the context of this decision, has been defined as "any geologic formation which is capable of transmitting water" (Tr. at p. 323).

decree first provides a plan to require Hooker to find out what is happening above and below the surface in the affected area. One point which emerges clearly from the record and is not disputed by any of the parties or opponents is that more information is needed regarding the geology and hydrogeology of the area. The extent of chemical migration must be carefully delineated. This can be done only through a series of tests designed specifically for use in the Site.[3] Next, after accurate data is obtained, the decree requires Hooker to provide a definite plan for remediation. Both phases will be carried out under the observation and supervision of the governmental parties and the court. After the proposed plan is accepted by the governmental parties, Hooker will be required to execute it, again under the supervision of the appropriate federal and state agencies and of the court.

Stripped to its essentials, the decree provides a mechanism for ascertaining the migration of chemicals, for the containment of the chemical waste, and for the monitoring and maintenance of this containment program. Compliance with the decree is measured in terms of a performance factor. Goals of the settlement are protection against "endangerment to human health and the environment in the Hyde Park—Bloody Run Area utilizing Requisite Remedial Technology to achieve the purposes set forth in this judgment." Settlement agreement, pages 6–7.

Initially, the document requires Hooker to employ routine, long recognized methods for containment of liquid matter, such as purge wells and tile drain systems. As a primary containment method, the parties anticipate that Hooker shall install a cap consisting of a minimum of 3 inches of asphalt or 6 inches of reinforced concrete over the Site and surrounding areas which contain leachate. The boundaries of the area to be capped are to be determined by

---

**3.** The opponents to the settlement agreement question the propriety of entering into a consent decree prior to the results of these tests being ascertained and of leaving the responsibility for the testing to the defendant. It was submitted that the tests could best be performed by the governmental parties to ensure the integrity of the results.

The evidence shows that it is not feasible to impose this burden upon the governmental parties. The magnitude of the problem of potentially dangerous waste disposal sites, nationwide, has been well publicized. Dr. Lamar Miller, a witness for plaintiff Environmental Protection Agency, testified that between the summer of 1979 and the fall of 1981, the Environmental Protection Agency identified over 9,700 potentially hazardous chemical disposal sites (Tr. at p. 38).

The Agency's resources are limited. Dr. Miller testified that as of the date of the hearing, 283 persons were employed by the Agency on a full-time basis, and 160 additional personnel were available on a contract basis (Tr. at p. 39) to investigate the disposal sites. Given the magnitude of the problems and in light of these restrictions, Dr. Miller testified that Agency practice in any lawsuit is to request that the court order the defendant to determine the full areal extent and route of the pollution, and to order the defendant to submit a plan for remediation (Tr. at p. 43).

Although the Hyde Park Landfill was designated as one of the Agency's highest priorities, it is clear that the complexities of this case and the comprehensive testing procedures called for by the agreement would require a disproportionate allocation of Agency time and funds. Moreover, as is reflected in the record, the Agency practice reflects a belief that is appropriate to require the defendant who is responsible for the potentially dangerous situation to bear the expense of the investigation and remedy (Tr. at p. 45).

Although the evidence shows that the Agency has been able to issue administrative orders to a potential defendant prior to the institution of a lawsuit in some situations, as a general rule, prior to the 1980 Amendments to the Resource Conservation and Recovery Act, the government was powerless to order a defendant to perform certain tests absent a court judgment.

In view of all the circumstances, the court cannot say that the portion of the agreement requiring Hooker to perform the tests should be stricken. Nor does the evidence indicate that this decree should await the completion of the tests called for by the agreement. The agreement provides adequate safeguards to ensure the veracity of the test results. As noted in this decision, all tests performed by the defendant must meet the stringent standards of the Environmental Protection Agency and the State. Further, any protocols utilized must be submitted for approval, and test results will be reviewed and verified.

surveys undertaken by Hooker pursuant to Addendum I(b) with the approval and under the supervision of the governmental parties.

These procedures direct Hooker to take 18-inch soil samples at 200-foot intervals along the parameter of an area surrounding the Landfill Site. The samples will be analyzed for various indicator chemicals which will be discussed below. If the chemicals are present, more samples will be taken further away from the Site. The sampling must continue in an ever-increasing circle around the Site until "clean" soil samples are finally taken at 200-foot intervals.

To ensure that this is the boundary of the contamination, Hooker must then take more samples from an area in between the 200-foot spaces and test this soil. Finally, 5 soil samples must be collected and analyzed specifically for the presence of TCDD. If the analysis confirms that the area is free from TCDD, this shall be the outer boundary of the area to be capped.

As mentioned above, the soil samples taken will be analyzed for the presence of certain chemicals which are listed in Addendum I at designated levels. These chemicals are to be used as indicators of or surrogates for other chemicals, including TCDD. *Amici* object to the use of such surrogates and the purposes for which the decree will utilize them. *Amici* contend that Hooker should be required to test directly for TCDD and for other chemicals because the surrogates are not capable of determining the presence and concentration of other chemicals in minute dosages.

These issues were brought forward and discussed in great detail during the fact-finding hearing. The governmental parties' and Hooker's witnesses testified that the surrogates were carefully selected based upon their known existence in large quantities in the Site and upon their ability to migrate rapidly. The settlement proponents concede that some of the chemicals may already have migrated beyond the Site, leaving only insignificant traces of their existence behind. The experts who testified at the hearing, however, were in agreement that during the course of migration, the indicator chemicals would indeed leave behind traces or "fingerprints." Thus, the proponents contend that these chemicals will be found on the leading edge of any plume of contamination, and the chemicals, including TCDD, will be contained therein.

There is some disagreement regarding the feasibility of routine direct testing for TCDD. An examination of the proposed settlement agreement demonstrates that Hooker will test directly for TCDD, if not routinely, at least before any final determination regarding the boundaries of the area to be capped is made. Under the settlement decree, no negative inference can be made regarding the absence of TCDD. While the presence of the surrogate chemicals will indicate the presence of TCDD, their absence may not be used to determine that the area is free from such contamination.

In view of all the evidence, the court is satisfied that the settlement decree ensures, to the extent possible under currently existing technology, that the area of the contamination of these chemicals will be explored, mapped, and finally defined.

In addition to the cap, Addendum I requires Hooker to continue to operate the tile drain system currently in use at the Site and to install supplemental tile drain systems approximately 25 to 30 feet from the Site and 10 feet deep into the overburden. To collect chemicals which may have migrated below the overburden into the layers of bedrock beneath, Hooker must install a system of purge wells.

These collection systems are designed to draw back any water moving through the overburden or bedrock, using the soils themselves as the hydraulic connection between the leachate and the collection system. The systems must contain facilities for pumping and storing. Under the terms of the settlement, the contaminated water will be collected, pumped into temporary

storage lagoons, and, within one year, into permanent storage containers.[4]

The parties are concerned in particular with the treatment of Bloody Run Creek itself, since this is a major conduit for contaminated water. Under Addendum I, Hooker is given two options: either excavation or capping of the creek. Before making its choice, however, Paragraph F of Addendum I requires Hooker to perform a study to determine the merits of the options in question.

The settlement decree contains an additional safeguard for Bloody Run Creek. Within 30 days after the judgment is entered, Hooker must designate an organization to evaluate the option and submit the name of the organization to the governmental parties for approval. Hooker must also submit the results and data on its study to the governmental parties.

It is evident from the agreement that the defendants are not to proceed along any stage of remediation without adequate supervision from the governmental parties and the court. Moreover, concerns for the health and safety of the residents and individuals who will be working at or near the Site are reflected in the agreement as well. Safety precautions are written into the agreement. Paragraph M of Addendum I requires a continuous operation of a dust monitor system whenever any remedial construction is taking place. If the dust level exceeds the normal background level of dust in any 15-minute period, all work must be stopped until this can be corrected. Hooker must also perform daily chemical analyses of dust samples. Again, all work will stop and corrective action will be undertaken if contaminated dust is found migrating three times within a given 30-day period.

Contaminated dust must not spread into surrounding areas. Excavated areas must be kept moist to keep dust down, and any soils transported for one reason or another will be kept in tightly sealed containers.

Workers' health will be protected also. All employees involved in on-site remedial construction will be given a comprehensive physical examination before work begins and again six months later. If the employee desires, another examination one year after termination of employment will be available. In addition, workers will be provided with safety equipment, including respirators and protective clothing. Addendum III of the settlement agreement requires that the defendants maintain the containment and monitoring program for a period of at least 35 years unless the defendant demonstrates to the satisfaction of the governmental parties and the court that the monitoring indicates that no chemicals have been collected for at least four consecutive years. The agreement also contains criteria for determination of whether the collection systems are effective.

Beyond the basic methods described above,[5] if they prove to be inadequate to

---

4. The presence of the lagoons was a source of controversy throughout the settlement hearings. The applicants for intervention viewed them as a possible source of contamination representing a danger to the health of area residents. The College Heights Property Owners Association and Niagara Falls Citizens Alliance, in particular, expressed concern over the fact that the lagoons are covered by only a plastic shield and that the chemicals contained therein will volitize through the shield. The applicants contend that under the terms of the settlement agreement, the lagoons would remain in place in perpetuity.

This concern has been addressed to the court's satisfaction. Dr. Frank Rovers of the consulting firm of Conestoga-Rovers stated that Hooker will construct new steel storage facilities within a year of the date the settle- ment is approved. The existing lagoons will then be dismantled and destroyed (Tr. at pp. 1267, 1271).

In addition, the court is satisfied that the methods to be utilized for disposal of the contaminated materials in the lagoons and the monitoring systems contained in the agreement are adequate for the task and reflect concern for the health and safety of area residents.

5. This discussion is intended to be only a brief summary of the terms of the settlement agreement. The agreement contains additional, extensive provisions regarding the procedures to be utilized for testing within the bedrock, clean-up programs to be undertaken for the Niagara Gorge and the area culverts and storm sewers, as well as Hooker's responsibilities re-

the task of retrieval and containment, the document is not specific as to the methods which will be utilized to prevent further contamination. Instead, the settlement decree states that Hooker is to address, that is, to treat, any contamination by using Requisite Remedial Technology.

Requisite Remedial Technology [RRT] is a crucial component of this agreement. "Remedial Technology" is defined in the agreement as "engineering and construction practices used or accepted for use in landfill containment projects or other industrial projects which are applicable to the materials and hydrogeologic conditions found at the Landfill Site." *See* paragraph 4A of the proposed settlement agreement.

Once a specific technology has been designated as remedial, that is, that its use is acceptable for the Landfill Site, a number of factors must be taken into consideration to determine whether the technology is "requisite." The factors are listed in paragraphs 4B and C. There are three primary factors to be taken into consideration. They are:

The nature of the endangerment to human health and the environment which the remedial technology is designed to address; the extent to which application of the remedial technology would reduce such endangerment to human health and the environment or would otherwise benefit human health or the environment; and the economic cost required to apply the remedial technology.

Next, a determination must be made whether this technology is the appropriate one to be used. This decision is made by reference to paragraphs C–8 and C–9 of Addendum 1 of the agreement. These sections require Hooker to submit all data from its study to the governmental parties for examination. Hooker must submit a study to determine what RRT is required

and must also submit a statement of alternative technologies examined and Hooker's reasons for disregarding them as RRT. Once a determination is made that the procedures constitute RRT, Hooker must apply these procedures, unless a determination is made by the court that the technology is unnecessary or that it would be arbitrary and capricious to force Hooker to implement the technology. *See* paragraph 4C of the Settlement Agreement.

While at first the terms seem ambiguous, closer examination of RRT and its use in the settlement documents reveals that the concept is an enormously flexible one which, with adequate safeguards which are written into the agreement, makes it a viable, workable solution to the problem. By the inclusion of the term in the settlement decree, the defendant has agreed to commit itself to undertake a massive investigation of the Site. The defendant is obligated to map and to address the contamination to whatever extent it is found. The term RRT is necessarily loosely defined, because at this time, it is impossible for any party or non-party to know what methodology will be appropriate and will be most successful in halting the leaching process.

This need for more knowledge and specific studies was expressed time and time again throughout the proceedings by experts from every field. Further studies are needed to identify both the extent of chemical migration and the exact nature of the geology and hydrogeology at the Site. Although the parties and *amici* disagree regarding the stratigraphic and hydrogeologic makeup of the area, the experts who testified during the hearing agree that it is impossible to determine precisely at this time the path of migration of chemicals in the overburden or bedrock. Such knowledge can be obtained only through the use of additional data which will become available under the terms of the agreement.

garding the acquisition of necessary easements, permits, and rights of way.

In view of the applicable standard of review discussed above at pages 1071–1073, it is not the court's intention to make the detailed findings of fact which would be required after a trial on the merits. Instead, the court will note

briefly that the agreement in its entirety was the subject of the fact-finding hearing and has been reviewed by all parties and the court. The court has no objections to these various provisions, and they will be implemented pursuant to the terms of the agreement.

With regard to the hydrogeology of the ground beneath the Landfill, both sides made reference to the United States Geological Survey Report prepared by Mr. Richard Johnston. Mr. Johnston himself, however, clearly stated that his study provides only "generalized information" and could not be used to make Site specific evaluations concerning movement of groundwater and leachate migration in the Hyde Park Landfill (Transcript at p. 242). This was echoed by geologists and by the other experts who testified during the hearing.

It bears repeating that the defendant is not to be given a free rein at any stage with regard to any proposed remedial work. All projects will be undertaken only under the supervision of the federal and state plaintiffs and ultimately the supervision of the court. Under the terms of the settlement agreement, Hooker is required to submit well logs, chemical analyses, estimates of cost, anticipated benefits to the public health and the environment, and all other plans and protocol concerning the RRT to the EPA and the State. See Addendum I(c)8(a–k). In addition to these protections, the decree provides a mechanism for dispute resolution by recourse to the court.

Under the agreement, the governmental parties have reserved the right to enter onto the premises to inspect the Landfill Site and to examine data compiled by Hooker. Representatives for the governmental parties have assured the court on numerous occasions that this information will be made available to the public and that comments and suggestions from interested persons are encouraged. *See* Transcript at p. 1926, 1939.[6] Moreover, regardless of the specific terminology of the settlement agreement, Hooker at all times will be held to its performance standard. For example, although the agreement requires testing to the top of the Rochester Shale Zone, if it is determined that the entire Lockport Dolomite Zone is contaminated, the performance standard will require Hooker to undertake studies into the Rochester Shale Zone to see what must be done to contain the migration.

*Amici* and the proposed intervenors express concern, also, regarding the performance standards themselves. They contend that the 90 percent recovery standard for bedrock contamination found in the agreement will not adequately address the problem of leachate contamination, for a system which allows 10 percent of these chemicals to escape into the ecosystem is not acceptable. *Amici* contend that *in situ* remediation of any kind will be ineffective to combat the contamination. The only viable safeguard for the environment, in their opinion, is the removal of the Landfill wastes and their incineration or re-entombment in an impermeable clay vault.

*Amici's* position regarding the performance standard is not persuasive. The proposed stipulation and judgment approving the settlement agreement is an integrated document and must be considered as a whole. In addition to the 90 percent retrieval requirement for bedrock contamination, the agreement provides a more general overall performance standard which is cited above at pages 12–13, *i.e.*, the protection against endangerment to human health and the environment. Moreover, with regard to *amici's* specific objections to the 90 percent collection standard from the purge well system, the court notes that this system is supplemented by other traditional collection systems, such as the overburden barrier collection system, and also by the provision contained within paragraph C8 which directs Hooker to determine the appropriate RRT, should migration occur outside the area covered by the traditional collection system.

With regard to *amici's* suggestion for excavation of the contents of the Landfill, the

---

6. In open court on October 16, 1981, the attorney for the United States Department of Justice stated that any information received from the defendant will be available for public inspection at the Environmental Protection Agency's Love Canal Office in Niagara Falls, New York, and that the New York State Department of Environmental Conservation will make such information available at its Region Nine Office in Buffalo, New York.

court notes that this issue was discussed thoroughly during the settlement hearing. Many witnesses testified that since the extent of the contamination is unknown at this time, it is impossible to determine with any precision the amount of materials to be excavated. This alternative was considered during the settlement negotiations, and while it has not been ruled out for all time, it is not acceptable as a remedy of initial consideration.

It is possible that Hooker tests and studies regarding migration of the chemicals will demonstrate that no containment program will meet the performance standards. It is possible that the governmental parties in their capacities as supervisors of Hooker's proposals for RRT will conclude that the containment programs are inadequate. If such is the case, then ultimately Hooker may be forced to excavate the materials as part of a remedial program. Until such studies are undertaken, however, it is impossible, on the basis of this record, for the court to make the determination that excavation is the only solution to the Hyde Park Landfill issue. Instead, the court is in agreement with the proponents of the settlement document that a careful, multi-faceted approach to these issues is the acceptable way to proceed.

Finally, the opponents of the settlement agreement expressed their fear that should the compromise expressed in the agreement ultimately be ineffective, the defendant will never be called to account for its actions. That is, under the terms of the agreement, Hooker's compliance with the terms of the agreement will constitute a complete defense to any future actions which the governmental parties might bring.

Section 11(c) of the agreement does state:

Compliance with the provisions of this Judgment shall be considered a complete defense to any action any governmental party hereto may hereinafter bring against [defendant] which arises out of or relates to the migration or discharge of chemicals or other substances from the Landfill Site occurring subsequent to the effective date of this Judgment ....

The final sentence of the paragraph, however, adds numerous exceptions to this general release, including actions brought for injunctive relief relating to migration and discharge (except for migration whose occurrence was known or could have been reasonably anticipated), actions for injunctive relief founded upon subsequently enacted statutes, and actions based upon violations of permits or violations of statutes or regulations promulgated thereunder.

Section 11(d) further states:

Nothing in this paragraph shall be deemed to waive or release any claims by EPA/State which arise out of claims subrogated to EPA/State by a non-party to this action where EPA/State has been required by applicable federal or state statute to compensate such non-party for injury caused by the discharge or migration of chemicals from the Landfill Site prior to the effective date of this Judgment.

Section 11(f) states:

Nothing in this paragraph shall be deemed to waive or release any cross-claims for contribution and/or apportionment by the Town of Niagara or the Town of Lewiston asserted against [defendant] in any pending or future legal action brought by a non-party to this action for damages for injury allegedly caused by the discharge or migration of chemicals from the Landfill Site.

Moreover, it should be emphasized that the impact of the judgment is not all-encompassing and will not resolve the entire range of litigation commonly known as the Love Canal case. This judgment will not, and indeed cannot, absolve Hooker from liability in actions brought by private individuals who are not parties to the settlement.

*VII. Conclusion*

█ Applying the standard of review discussed above, it is clear that this proposed settlement must be accepted.

Weighing strongly in favor of the approval is the fact that the plan can be implemented immediately. Rejection of the plan

would result in the expenditure of considerable time, money, and effort in litigation. In the meantime, chemicals from the Site would continue to leach out and further contaminate the surrounding area.

And, of course, as in any lawsuit, plaintiffs have no guarantee of ultimate success. The resources of the governmental parties are limited. If forced to prosecute, they might well extend inordinate amounts of these resources on this single Landfill Site, to the detriment of other areas in other parts of the country. We must keep in mind that the Hyde Park Landfill is only one of many such sites.

Most important, the court finds that there is no evidence in the voluminous record to indicate that even after a favorable decision at the end of a protracted trial any remedy could be fashioned which would be more advantageous to the government or to the residents of the community.

■ The proposed consent decree is not, as its opponents contend, an arbitrary and capricious agreement. Indeed, few characterizations could be further from the truth. The decree reflects a good faith effort to arrive at a consensus among the parties and to address the concerns of all. The group of men and women who comprise the settlement negotiation team are experts in their respective scientific fields. The settlement was the subject of extensive arms-length bargaining and was approved by counsel for all parties. It was, moreover, approved by the state and federal agencies which are charged with the implementation and review of the various environmental protection statutes. This approval carries with it a strong presumption of validity.

The court is convinced that this settlement agreement represents a good faith effort on the part of the parties to address the issue to the fullest extent of currently existing technology. The settlement agreement is satisfactory and shall be approved.

## VIII. Supplemental Issues

Two additional issues remain to be decided in this case. As noted above, Mr. Norman Martelli moved to intervene on March 13, 1981. His petition was followed by that of two organizations known as the College Heights Property Owners Association and the Niagara County Citizens Alliance, who filed a petition on March 20, 1981. The applicants base their petitions primarily upon the "Citizens Suit" provisions of the Clean Water Act, 33 U.S.C. § 1365(b)(1)(B) and the Resource Conservation and Recovery Act [RCRA], 42 U.S.C. § 6972, and upon Rule 24 of the Federal Rules of Civil Procedure. The petitions are opposed by the defendant on the grounds that the applicants lack standing under the environmental acts and are not entitled to intervene as a matter of right pursuant to Rule 24. Defendant further argues that the petitions are untimely and that permissive intervention should be denied by the court pursuant to Rule 24(b).

Both sides have submitted extensive memoranda of law to the court. Upon careful consideration of these documents and the applicable case law, it is the court's finding that the petitions for intervention shall be granted for the reasons discussed below. The court further finds, however, that this order does not give the intervenors veto power over the settlement, and my decision approving the settlement remains unchanged.

### A. The Applicants' Right to Intervene

■ Rule 24(a)(1) of the Federal Rules of Civil Procedure directs that "[u]pon timely intervention anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene...."

The court is of the opinion that such a right is granted to the petitioners by the Citizens Suit provision of the Clean Water Act.[7] 33 U.S.C. § 1365 provides that any

---

7. The court concludes that the applicants do not have a right to intervene under the "citizens suit" provision of the Resource Conserva-

tion and Recovery Act [RCRA], 42 U.S.C. § 6972. The RCRA's citizen suit provision is more limited than its counterpart under the

citizen may commence a civil action on his own behalf for a violation of the provisions of the Act, with the following exception. Section 1365(b)(1) states:

No action may be commenced—

(1) under subsection (a)(1) of this section—

\* \* \* \* \* \*

(B) if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order, but in any such action *in a court of the United States any citizen may intervene as a matter of right.* [Emphasis added.]

The word "citizen" is defined by the act as "a person or persons having an interest which is or may be adversely affected." 33 U.S.C. § 1365(g).

Defendant contends that the inclusion and definition of the word "citizen" reflect a congressional intent to authorize intervention only if the standing requirement set forth by the United States Supreme Court in the case of *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) is met. That is, the adversely affect-

ed interest of the proposed intervenor must be a specific one and not a generalized concern with the issue. *See United States v. Ketchikan Pulp Company,* 74 F.R.D. 104 (D.Alaska 1977).

Applying this standard, the court finds that the applicants for intervention have satisfied the standing requirement. As the petition of the College Heights Property Owners Association and the Niagara County Citizens Alliance and the proposed amended complaint of Mr. Martelli demonstrate, the applicants are residents of the area close to the Site. Mr. Martelli resides in the Town of Lewiston, New York. His home is one of the closest residences to the Site, and he alleges that his property is to be tested for the presence of toxic chemicals if the agreement is implemented. In his memorandum of law submitted in support of his proposed amended complaint, Mr. Martelli states that he has alleged in the past that dust from the Landfill has contaminated his property and that he fears further contamination will result from any remedial work undertaken at the Site.

With regard to the College Heights Property Owners Association and the Citizens Alliance, the court notes that the United States Supreme Court has held that an or-

Clean Water Act, 33 U.S.C. § 1365. Under the RCRA, a person may commence a suit

(1) against any person . . . who is alleged to be in violation of any permit, standard, regulation, condition, requirement, or order which has become effective pursuant to this chapter . . . .

42 U.S.C. § 6972(a)(1).

42 U.S.C. § 6972(b)(2), however, contains a limitation similar to that of the Clean Water Act. That section states:

(b) Actions prohibited.—No action may be commenced under paragraph (a)(1) of this section—

\* \* \* \* \* \*

(2) if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States or a State to require compliance with such permit, standard, regulation, condition, requirement, or order. *Provided, however,* That in any such action in a court of the United States, any person may intervene as a matter of right.

The court finds that the instant action does not fall within the Citizens Suit provision of the RCRA because the plaintiffs do not seek compliance with any "permit, standard, regulation, condition, requirement, or order." Instead, plaintiffs seek injunctive relief pursuant to 42 U.S.C. § 6973.

42 U.S.C. § 6973 empowers the Administrator of the Environmental Protection Agency to file suit on behalf of the United States when there is reason to believe that a situation exists which presents an "imminent and substantial endangerment to health or the environment." This section does not contain a provision granting leave to intervene.

Accordingly, because the complaint does not state a cause of action under the RCRA which falls within section 6972(b), the applicants' right to intervene under Rule 24(a)(1) of the Federal Rules of Civil Procedure is limited to the claims stated under the Clean Water Act.

ganization is capable of possessing the requisite standing to protect its members in a judicial proceeding. *Sierra Club v. Morton, supra* at 739, 92 S.Ct. at 1368. The proposed amended complaints of the two organizations illustrate that their members can indeed allege injury in fact resulting from the defendant's actions. The College Heights Property Owners Association states that its members reside and own property in the area immediately adjacent to the areas into which Bloody Run drains. They allege specific injury in that the value of the property of the members has depreciated because of the presence of the chemicals contained within the Site and the public perception of the dangers these chemicals represent. The intervenors allege additionally that their health has been affected by exposure to the contaminants. The membership of the Niagara Falls Citizen Alliance includes residents from the same area. They allege the same kind of injuries as those raised by the College Heights Association.

■ Defendant characterizes these kinds of allegations and injuries as "amorphous" and contend that they are insufficient to establish standing under the *Sierra Club* doctrine. The defendant notes that the intervenors have not established that they *will* suffer any injuries. Neither the Federal Rules nor the Clean Water Act, however, has such a strict requirement of standing as the defendant would have us hold. The test is not whether the applicants for intervention have been or will certainly be harmed by the defendant's action, but whether their interests *may be* adversely affected. The court finds that these intervenors have established that their interests in the case are substantial and that these interests may be affected by the consent decree.

Indeed, organizations such as these intervenors were allowed to intervene in the case of *United States v. Ketchikan Pulp Company, supra.* In that case, three organizations alleged that their members "use and depend upon the waters of the United States for food supply, transportation and recreation," in that members of one organization "derive a portion of their livelihood from commercial fisheries which may be impacted by [defendant's] discharge." It was further alleged on behalf of a second organization that "the waters which may be impacted by [defendant's] discharge are used by members of the Alaska Center for recreation." 74 F.R.D. at 106. The court noted that the Citizens Suit provision of environmental statutes are to be broadly construed to allow the greatest possible input from residents and found that the interests asserted were not generalized interests but were sufficient to confer standing upon two of the three organizations which sought permission to intervene.

■ The defendant's next argument is that the petitions for intervention are untimely and must be denied on that ground. It is well settled, however, that timeliness is but a single factor to be considered by the court when deciding a motion for intervention. *See* Moore's Federal Practice, Vol. 3B, ¶ 24.13, and cases cited therein. The petitions for intervention were filed within two months after the consent decree was lodged with the court. The petitions made clear that the purpose for intervention was to contest the validity of the consent decree, to challenge the settlement, and to present the citizens' objection to the consent decree. The intervenors raised the issue of whether an evidentiary hearing was necessary both to explore their objections and to further explain the terms of the proposed settlement. Given that their rationale for seeking intervention did not come into being until January 1981, the court cannot say that these applications are untimely as a matter of law and that intervention for the purpose of objecting to the consent decree should be precluded on this ground.

In a case decided under the Clean Air Act, 42 U.S.C. § 1857 *et seq.*, which contains a Citizens Suit provision similar to that of the Clean Water Act, the United

States Court of Appeals for the Second Circuit noted that in environmental lawsuits, the intent of Congress is clearly that "citizen groups are not to be treated as nuisances or troublemakers but rather as welcomed participants in the vindication of environmental interests." *See Friends of the Earth v. Carey*, 535 F.2d 165, 172 (2d Cir. 1976). In this case also, the participation of the intervenors, and of *amici*, has been welcomed and very much appreciated by the court, and the motions seeking leave to intervene are granted.

### B. The Intervenors' Status

■ As noted above, the petitions were filed after extensive negotiations had resulted in the settlement agreement among the parties. The petitions were filed with the purpose of objecting to and raising concerns regarding the settlement agreement. At the time the petitions were filed, the government did not object specifically to the intervention but noted its objection, along with the defendant, to the intervenors' and *amici's* request for an evidentiary hearing. Over the objections of the parties to the settlement agreement, the court held that such a hearing was necessary, and it took place as detailed above.

It appears, then, that the intervenors have fulfilled their expectations and have been given an adequate opportunity to make their views known and have their objections raised. Since the motion to intervene was not filed until after the consent decree was lodged with the court, this court, had it granted the motion at that time, would have been required only to permit the intervenors an opportunity to present to the court its members' interest in the proposed remedy. That the intervenors had such an opportunity cannot seriously be debated. In my order of August 12, 1981, I permitted the intervenors to present witnesses, to cross-examine witnesses, and to fully brief the issues which arose during the hearing. It is well settled that " '[t]he right to have its objections heard does not, of course, give the intervenor the right to block any settlement to which it objects.' " *Zipes v. Trans World Airlines, Inc.*, —— U.S. ——, 102 S.Ct. 1127, 1131–32, 71 L.Ed.2d 234 (1982), *quoting Air Line Stewards and Stewardesses Ass'n v. Trans World Airlines*, 630 F.2d 1164, 1169 (7th Cir. 1980); *and see Moore v. City of San Jose*, 615 F.2d 1265 (9th Cir. 1980); *Airline Stewards and Stewardesses Ass'n v. American Airlines*, 573 F.2d 960 (7th Cir.), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978); *E.E.O.C. v. American Tel. & Tel. Co.*, 556 F.2d 167, 173 (3d Cir. 1977), *cert. denied*, 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1978).

Accordingly, the court finds that the intervenors have had an adequate opportunity to object to the settlement. Having listened to these objections, having examined all of the testimony, having developed the record to the fullest possible extent, it is the court's finding that the settlement decree shall be entered over the objections of the intervenors.

■ The other matter to be decided concerns the testimony of one of the witnesses who testified at the hearing. David Bruce Twedell was offered by the United States as an expert in the field of hydrogeology. Mr. Twedell represented to the parties and to the court that he received a B.S. degree in 1975 and a Ph.D. in geology in 1979, both from the University of Houston. He testified in that capacity during the hearing on September 10–11, 1981.

In November of 1981, the United States received information which cast doubts upon Mr. Twedell's representations as to his qualifications and background. Preliminary investigations showed that Mr. Twedell holds only a B.A. degree from the University of Houston which he received in 1979 and that he does not have any graduate degrees.

Commendably, the United States acted promptly in bringing the matter to the court's attention. After being informed of

the development, the court immediately scheduled a meeting for all parties to take place on November 30 in chambers. On that day, they were acquainted with Mr. Twedell's false representations and informed that the United States Department of Justice, Criminal Division, was conducting an investigation into the matter. The United States filed a motion to withdraw David Twedell's testimony with supporting affidavits attached.

*Amici* and the intervenors, in particular, voiced concern with this development. Because of the need to develop the record in all respects and to explore any possible weak links in the settlement agreement, *amici* and the intervenors were given an opportunity to file memoranda in opposition to the motion, and the settlement proponents were given time to reply.

Having examined the affidavits and documents submitted and having carefully reviewed the transcript of Mr. Twedell's testimony, the court finds that the government's motion should be allowed. The court finds, further, that the withdrawal of this testimony has no significant impact upon the decision regarding the settlement agreement.

*Amici's* objections center upon Mr. Twedell's role as the sole hydrogeologist on the negotiating team. Basically, *amici* contend that Twedell's testimony was a crucial component of the settlement negotiations. Without this testimony, they claim, the integrity and credibility of the settlement negotiation are nullified and the viability of the settlement falls.

The court is not in agreement with this view. Simply stated, *amici* have overemphasized the importance of Mr. Twedell and his role on the negotiation team and during the hearing process. Although *amici* and the intervenors are correct in their contention that Mr. Twedell was the only member of the negotiation team who represented himself as having formal advanced training in the field of hydrogeology, the team of experts who participated in the settlement

negotiation was a formidable band of professionals, many of whom were qualified to perform the functions Mr. Twedell performed. The representatives of the federal government who were part of the team consisted of 20 scientists, in addition to Mr. Twedell. These scientists are experts from the various fields of chemistry, geology, engineering, health sciences, and environmental sciences. *See* Joint Response to Court Order of February 12, 1981, at p. 3. In addition to these scientists, professional advice was contributed by experts from the New York State Department of Environmental Conservation and the defendant's scientists, all of whom presented impeccable credentials. *Id.* at pp. 5–7. In addition, a number of these experts had "hands-on" experience with the Niagara Falls area.

The transcript shows that Mr. Twedell acted in a supervisory capacity, reviewing the work of "a multiple scientific group" consisting of chemists, chemical engineers, civil engineers, mechanical engineers, geologists, soil scientists, and others [Transcript at p. 366]. Mr. Twedell acknowledged that he was the coordinator of the technical team, evaluating the hydrogeologic data, but stated that the data were reviewed by the other members of the staff as well. None of the members of Mr. Twedell's "tainted" team was engaged in the compilation of the raw data. The data was gathered primarily by the defendant and its team of experts, including the prestigious consulting firm of Conestoga-Rovers, and by the governmental agencies.

Contrary to the suggestions of *amici* and the intervenors, there is nothing to indicate that these data are not accurate or that they were not gathered in conformance with proper scientific protocol. The material was reviewed by a number of scientists other than Mr. Twedell, none of whose credentials has been questioned. It would be giving too much importance to any one member of the multi-disciplinary team to say that the work of the entire team must be discredited because of the false represen-

tation of a single individual. Accordingly, the court does not accept the contention that the credibility of the negotiating team is nullified by Mr. Twedell's presence on it.

With regard to his contributions to the hearing process, Mr. Twedell testified primarily about the proposed containment procedures. He described the mechanics of purge well and tile drain systems and testified as to their anticipated effectiveness within the Site. This testimony was corroborative of that of Mr. Paul Counterman, an engineer who is chief of the chemical technology section of the New York Department of Environmental Conservation, and Mr. Kernan Davis, an engineering geologist, also of the New York Department of Environmental Conservation, who has extensive experience with the geology of the Niagara Falls area, particularly with the Hyde Park area.

Mr. Twedell testified also regarding water flow through the bedrock and the overburden at the Site. His testimony on that subject was couched in general terms, particularly when called upon to project the future to determine whether RRT will be required and, if so, what form it will take. During cross-examination, he addressed the controversy surrounding the selected plume definition levels and the danger of migration taking place below the action level. It is clear from the transcript that the selection of the levels was not made by Mr. Twedell and that his participation with respect to this matter was limited. Mr. Twedell referred again and again to the testimony of Dr. Lamar Miller, who is the technical director of the Office of Hazardous Waste Enforcement of the Environmental Protection Agency. Dr. Miller is a chemical engineer, and Mr. Twedell bowed to Dr. Miller's greater expertise.

The only specific contribution Mr. Twedell made during the hearing was his statement to the effect that he was satisfied that the general direction of ground water flow was to the northwest away from the Site. Even on that score, however, his testimony was tentative. He cautioned that his opinion regarding the direction of the flow was contingent upon the results of further tests, in particular, upon the results from an array of piezometers which are to be installed pursuant to the terms of Addendum I. He conceded that there may, in fact, be flow to the west, south, or southwest, and stated that this can only be finally determined when all the data have been collected.

Upon review of all the documents and transcripts, the court is in agreement with the government's contention that Mr. Twedell's testimony was cumulative and corroborative only, that this presence on the negotiation team did not compromise the integrity of the governmental due process, and that it does not require the rejection of the settlement agreement.

In summation, the court finds: (1) the proposed settlement agreement is satisfactory, and it shall be approved; (2) the motions to intervene are granted; (3) the government's motion to withdraw testimony of David Twedell is granted.

So ordered.

1086

Appendix A

figure 1
HYDE PARK-BLOODY RUN AREA
Hyde Park - Bloody Run

Conestoga - Rovers & Associates

Appendix B

Figure 6.—Generalized block diagram showing occurrence and movement of ground water in the vicinity of the city of Niagara Falls prior to construction of the Niagara Power Project.