**UNITED STATES of America, et al., Plaintiffs,**

v.

**HOOKER CHEMICALS & PLASTICS CORPORATION, et al., Defendants,**

**College Heights Property Owners Association, Niagara County Citizens Alliance, and Norman A. Martelli, Intervenors.**

**No. CIV–79–989C.**

United States District Court,
W.D. New York.

July 6, 1984.

U.S. Dept. of Justice, Environmental Enforcement Section, Land and Natural Resources Div., Washington, D.C. (Michael El-der, Washington, D.C., of counsel), for plaintiff U.S. of America.

Robert Abrams, Atty. Gen., State of N.Y., New York City (Ann Goldweber, Asst. N.Y. State Atty. Gen., New York City, of counsel), for plaintiff State of N.Y.

Wald, Harkrader & Ross, Washington, D.C. (Thomas H. Truitt, Washington, D.C., of counsel), for defendants Hooker Chemicals & Plastics Corp.

Seeger, Steele & Galeziowski, Buffalo, N.Y. (David J. Seeger, Buffalo, N.Y., of counsel), for intervenors.

CURTIN, Chief Judge.

This case is one of four environmental lawsuits commenced in December of 1979 by the Environmental Protection Agency [EPA] against Hooker Chemicals and Plastics Corporation [Hooker] and related corporate entities. The EPA sought injunctive relief under sections 309 and 504 of the Clean Water Act, 33 U.S.C. §§ 1319, 1364, and other environmental statutes. Hooker and the governmental plaintiffs reached a settlement in January of 1981.

On April 30, 1982, I issued a decision and order approving the Settlement Agreement. This decision was based upon evidence adduced at a hearing which extended over a period of eight days. Counsel for plaintiff-intervenors College Heights Property Owners Association [College Heights] and Niagara County Citizens Alliance [NCCA] participated in the hearing, taking the position that the settlement should not be approved. Despite this opposition, the settlement was approved without any modifications. In the same order in which I approved the settlement, I granted the motions of College Heights and NCCA to intervene in this case pursuant to section 505 of the Clean Water Act, 33 U.S.C. § 1365. *See United States v. Hooker Chemicals and Plastics Corp.*, 540 F.Supp. 1067 (W.D.N.Y.1982), familiarity with which is presumed. Plaintiff-intervenors now seek an award of litigation costs and attorney fees pursuant to section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d).[1] This application must be denied.

---

1. Section 505(d), 33 U.S.C. § 1365(d), provides in relevant part as follows:

■■■ The intervenors claim that their work in this case has resulted in various successes which, they argue, are significant enough to justify an award of costs and fees. Among these "successes" are my decision recognizing their right to intervene and various *"de facto modifications"* of the settlement agreement which the intervenors contend were the result of their participation in the evidentiary hearing. It is now clear that litigants who achieve no success or only trivial success on the merits cannot be awarded attorney fees in cases brought under the Clean Water Act. Nor may fees be awarded for purely procedural victories. *Ruckelshaus v. Sierra Club*, 462 U.S. 680, ___ n. 9, 103 S.Ct. 3274, 3279 n. 9, 77 L.Ed.2d 938 (1983).[2] A review of what the intervenors describe as their successes, *i.e.*, the "modifications" they brought about in the settlement, reveals that no successes were in fact achieved. For this reason, the court is without authority to order an award of attorney fees under the Clean Water Act's fee-shifting provision.

■■■ The intervenors argue that they are entitled to attorney fees because of the work done in connection with several different aspects of the Hyde Park lawsuit. The first is the success they achieved on their motion to intervene. However, the court notes the admonition by the Supreme Court that "purely procedural victories" should not justify fee awards pursuant to statutes such as that under consideration here. *Ruckelshaus v. Sierra Club*, 462 U.S. at ___ n. 9, 103 S.Ct. at 3279 n. 9. When an applicant moves to intervene in an action, the court is not asked to address the merits of the claim which the applicant seeks to assert. The court is asked only whether the motion is timely and if the applicant satisfies the other criteria of Rule 24 of the Federal Rules of Civil Procedure.

The court, in issuing any final order in any action brought pursuant to this section, may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate.

In this lawsuit, the intervenors achieved no success on the merits which could be viewed as even the indirect result of their success on the intervention motion. Under these circumstances, it is particularly appropriate to characterize the granting of that motion as a "purely procedural" victory. The intervenors' victory on their motion to intervene in this case was purely procedural. The work done in connection therewith cannot be the basis of an award of counsel fees under section 505(d) of the Clean Water Act. *Id.*

The intervenors also argue that their presence in this lawsuit resulted in four *"de facto"* modifications in the Settlement Agreement approved by the court in April, 1982. The first "modification" perceived by the intervenors consists of their belief that they obtained a commitment from Hooker to discontinue the use of existing clay-lined storage lagoons within one year, build steel storage tanks, and subsequently dismantle and destroy the old lagoons.

The intervenors plainly achieved no success on this matter. The motion for attorney fees was argued nearly two years after I approved the Settlement Agreement. In these two years, Hooker has not discontinued the use of the storage lagoons which the intervenors claim were earmarked for destruction within one year. Hooker is not now being cited for breaching the agreement. More important is the fact that the "commitment" to which the intervenors allude was, in fact, a contemporaneous estimation by Hooker's expert witness as to how long it would take to implement the portion of the Settlement Agreement dealing with the storage of contaminated water. In my decision approving the agreement, I noted that the lagoons were the cause of considerable controversy but that Hooker had addressed the problem satisfactorily. The statement by Hooker's ex-

2. *Sierra Club* dealt specifically with a fee-shifting provision in the Clean Air Act, *i.e.*, 42 U.S.C. § 7607(f). However, the Court stated that the holding in *Sierra Club* also applied to section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d). *Sierra Club*, 462 U.S. at ___ n. 1, 103 S.Ct. at 3275 n. 1.

pert that it would take a year to discontinue the use of the clay lagoons was cited in that context. *United States v. Hooker Chemicals and Plastics Corp.*, 540 F.Supp. at 1075–1076 and n. 4. The prediction that destruction of the lagoons would take a year was not a commitment extracted from Hooker by the intervenors. It was an opinion on what the pace of this part of the remedial work would be under the terms of the Settlement Agreement. The work of the intervenors resulted in no change to the agreement or to Hooker's obligations thereunder. Plaintiff-intervenors are not entitled to counsel fees for the position they took on the storage lagoons.

A second *"de facto* modification" said to have been brought about by the intervenors is a commitment not to preclude excavation as a means of dealing with actual and potential environmental dangers at the landfill. This contention by the intervenors is plainly wrong. The Settlement Agreement contemplates that the best and most appropriate remedies for all present and future dangers cannot be identified with certainty at the present time. *Id.,* at 1077. This perception gave rise to the inclusion within the agreement of the flexible concept of Requisite Remedial Technology [RRT]. *Id.*

On the basis of the record then before it, the court in April of 1982 was unwilling to make a finding that Hooker was required to excavate the materials at the landfill. However, the court expressly stated that if the RRT measures proposed by Hooker were unacceptable, "Hooker may be forced to excavate the materials as part of a remedial program." *Id.,* at 1079. The spacious and flexible concept of RRT obviously recognizes the possibility of excavation. Requisite Remedial Technology is crucial to the agreement, and its place in the agreement was assured by Hooker and the governmental plaintiffs, not the intervenors. The intervenors did nothing either to include excavation within the scope of RRT or to make the resort to excavation more likely. The intervenors achieved no success on this point. They cannot collect fees in the absence of any success.

The intervenors claim that they identified a previously unidentified swale area and obtained a commitment to remediate this area. I have carefully examined the record on this matter, and I conclude that the "commitment" obtained by the intervenors on this point was, in fact, the voluntary cooperation of the EPA to perform some testing in areas which may well have come to the parties' attention during the normal course of implementing the Settlement Agreement. The important point here is that it was the EPA that responded to the intervenors' concern. If the matter was covered by the agreement, then, of course, the efforts of the intervenors were not necessary. If it was not, then the efforts of the intervenors still would not justify an award of fees against Hooker, because the intervenors did not obtain any order requiring Hooker to do anything. The intervenors' "success" in gaining the voluntary cooperation of the EPA cannot be the basis of applying the fee-shifting statute against Hooker.

The fourth *de facto* modification cited by the intervenors is the obtaining of "commitments" from the EPA and New York State to sink the overburden tile drain system to the bedrock in order to ensure a 100 percent performance standard. However, the court is not persuaded that the efforts of the intervenors resulted in any change in the Settlement Agreement.

The intervenors have noted language in the agreement which provides that a new tile drain system shall be installed at an unspecified depth at least 10 feet below ground level. Settlement Agreement, Addendum I, p. 22. They contend that the agreement contains no performance standard for the collection of contaminated groundwater. The testimony of David Twedell is invoked by the intervenors for the proposition that a commitment was made to drop the tile drain system down to the bedrock. [Intervenor's memorandum, Item 274, p. 29.] This commitment is said to be the result of concerns raised by the intervenors. The court need only refer to

its own decision in the Hyde Park case to conclude that a "commitment" made by Mr. Twedell is worthless, at best. *See, United States v. Hooker Chemicals and Plastics Corp.*, 540 F.Supp. at 1083–85. However that may be, Mr. Paul Counterman, an environmental engineer testifying for New York State, stated that the tile drain system "will be placed at a depth to intercept all possible migration in the overburden, away from the landfill site ..." [Hearing Transcript at 634.] Mr. Counterman added that the depth of the tile drain system would depend upon what is necessary to "cut off overburden—contaminated ground water flow away from the landfill site, in the overburden." *Id.* at 636. The system will, he said, "pick up *all* water and also non-aqueous phase [liquids]." *Id.* (Emphasis added.) Mr. Counterman's testimony reflected his understanding of what was *required* by the Settlement Agreement. It was not the result of prodding by the intervenors, and no *modification* of the agreement occurred.

The intervenors speculate that their efforts resulted in a commitment by Hooker to purchase residential properties near the Hyde Park Landfill. The argument is that filing the complaint of intervention in March of 1981, plus the position taken in public comments at the same time, influenced Hooker to commit itself to making offers to purchase the properties.

This subject was dealt with in the court's order of October 14, 1983. There, I noted that Hooker did in fact commit itself to extending offers to purchase certain homes near the landfill. This commitment was stated in a letter dated March 24, 1981. In orders dated January 18, 1983, and October 14, 1983, I noted that Hooker's commitment became part of the Settlement Agreement, inasmuch as it reflected Hooker's view of what would be its "best efforts" in obtaining property rights necessary to carry out its obligations under the agreement. Order of October 14, 1983, at pp. 2–3, 8. The court declines any invitation to speculate on what might have induced Hooker to make its commitment to purchase the property. In the orders dealing

with Hooker's commitment, the commitment was always understood as Hooker's view of what its obligations were under the Settlement Agreement. The intervenors took no part in forging this agreement, and they were unable later to defeat or modify it. Furthermore, even if Hooker's decision to extend purchase offers was due in some way to the intervenors' efforts, this decision was made unilaterally. Hooker's view that buying the property was the best way to proceed was not a view imposed upon it by the court. Nor was it part of any settlement agreed to between Hooker and the intervenors. Hooker's commitment was a commitment to the court made in a letter addressed to the court. Only the EPA and New York State were plaintiffs at the time the commitment was made. The intervenors did not become parties until their motion to intervene was granted more than one year later. Hooker's commitment letter was not the result of a decision by the court that federal or state law required that the property be purchased. Nor was it the result of an agreement with the intervenors arrived at in lieu of a decision on the merits. The court believes that section 505(d) of the Clean Water Act would have to be stretched well beyond its intended limits if it were interpreted as allowing counsel fees to intervenors on the basis of actions taken well before they became parties to an action—especially when the impact of such actions is as speculative as it is here. The Clean Water Act does not afford the intervenors any right to counsel fees for the position they took on the purchase-of-property issue.

The intervenors have raised other points which need not detain us long. Fees are sought for their work in "filling out the record" in this lawsuit. This is not a proper basis for an award of costs and fees. A party can lengthen the record in a case without achieving any success on the merits. Counsel fees can be awarded only if a party succeeds, *Ruckelshaus v. Sierra Club*, 462 U.S. 680, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983), and the intervenors have achieved no success on the merits.

Fees are also sought in connection with an air-monitoring agreed to by the State. This matter did not involve Hooker, which was neither ordered nor otherwise compelled to do anything. The court believes it is inappropriate to compel Hooker to pay counsel fees for the intervenors' efforts in this area.

The court has carefully reviewed each aspect of the intervenors' motion and finds that none of the grounds asserted as a basis for an award of attorney fees has any merit. An award of fees in this case would be entirely inappropriate.

Since it is clear from the record that these intervenors achieved no success on the merits, the court need not address Hooker's argument that only original parties are permitted to seek an award of costs and fees under the Clean Water Act. *See* 33 U.S.C. § 1365; *compare*, 42 U.S.C. § 7604 (Clean Air Act).

### Conclusion

The intervenors' motion for litigation costs and attorney fees is denied.

So ordered.