UNITED STATES of America, et al., Plaintiffs,

v.

HOOKER CHEMICALS & PLASTICS CORPORATION, et al., Defendants.

No. CIV–79–989C.

United States District Court,
W.D. New York.

Aug. 11, 1986.

See also 776 F.2d 410.

U.S. Dept. of Justice, Environmental Enforcement Section, Land and Natural Resources Section, Land and Natural Re-

sources Div. (Wayne R. Walters, William J. Walsh, and George Shanahan, of counsel), Washington, D.C., for plaintiff U.S.

Robert Abrams, Atty. Gen. of State of N.Y. (Ann Goldweber, Asst. N.Y. State Atty. Gen., of counsel), New York City, for plaintiff State of N.Y.

Piper & Marbury (Thomas H. Truitt, and Keith S. Watson, of counsel), Washington, D.C., Phillips, Nizer, Benjamin, Krim & Ballon (Martin J. Wasser, of counsel), New York City, for defendant Hooker Chemicals & Plastics Corporation.

Lewis Steele, Buffalo, N.Y., for plaintiff-intervenor College Heights Property Owners Assn.

CURTIN, Chief Judge.

In April of 1982, this court approved a settlement agreement and proposed judgment [Settlement Agreement] dealing with the Hyde Park Landfill [the Landfill] cleanup. *United States v. Hooker Chemicals & Plastics Corp.*, 540 F.Supp. 1067 (W.D.N.Y. 1982).[1] It is now called upon to decide whether the parties' proposed Requisite Remedial Technology Stipulation [RRT Stipulation] (Item 379) should be approved.

As was stated in the 1982 order, the Hyde Park Landfill was used for more than two decades as a disposal site by defendant Hooker[2] for waste materials and by-products from its chemical manufacturing plant in Niagara Falls. It is estimated that some 80,000 tons of chemicals are deposited there, including between 0.6—1.6 tons of 2, 3, 7, 8–tetrachlorobenzo-p-dioxin [TCDD], an extremely toxic organic substance. Item 352, Affidavit of Charles Faust [Faust Affidavit], ¶ 43. *See also* Item 355, Affidavit of Dr. Neil S. Shifrin [Shifrin Affidavit], ¶ 23.[3] In recent years, studies have indi-

1. For a description of the location of the Landfill site, *see United States v. Hooker Chemicals & Plastics Corp., supra* at pages 1069–70.

2. Defendants include Hooker Chemicals & Plastics Corporation, Oxy Chemical Corporation, Hooker Chemical Corporation, Occidental Petroleum Investment Company, Occidental Petroleum Corporation, and the Towns of Lewiston and Niagara, New York. Although others of the

defendants have responsibilities under the settlement agreement, Hooker Chemical & Plastics Corporation is the entity primarily responsible for the Hyde Park Landfill. The term "Hocker" shall refer to this defendant.

3. For purposes of the instant order, it is important to summarize the geological makeup of the Landfill area. The uppermost geological stratum at the site is the so-called "overburden,"

cated that some portion of these chemicals have migrated and continue to migrate away from the Landfill site and into adjacent properties in the general direction of the Niagara River.[4] This migration has taken place in one of two manners: either dissolved in groundwater in the form of aqueous phase liquid [APL] or as a heavier separate chemical phase known as non-aqueous phase liquid [NAPL]. Faust Affidavit, ¶ 44; Shifrin Affidavit, ¶¶ 12–13.

In light of these circumstances, the Department of Justice, on behalf of the Environmental Protection Agency [EPA] filed a lawsuit against Hooker seeking cleanup of this Landfill on December 20, 1979, pursuant to, *inter alia*, section 7003 of the Resource Conservation and Recovery Act, 42 U.S.C. § 6973 and section 504 of the Clean Water Act, 33 U.S.C. § 1364. The court joined the State of New York [the State] as a party, pursuant to a motion by OCC, on May 11, 1980. The court granted the State's motion to realign as a plaintiff on July 8, 1980.

On January 19, 1981, the EPA, the State, Hooker, and the Towns of Lewiston and Niagara lodged the Hyde Park Stipulation and Judgment Approving Settlement Agreement [Settlement Agreement]. After an extensive public comment period, court filings, and an evidentiary hearing, this court approved the Settlement Agreement on April 30, 1982. *United States v. Hooker Chemicals & Plastics Corp., supra.* At the time of its approval, the court also granted the intervention motions of the College Heights Property Owners Association [CHPOA], Niagara Falls Citizens Alliance, and local resident, Norman Martelli.[5]

To briefly summarize, the court-approved 1982 Settlement Agreement prescribed a phased approach to remediation at the Landfill which, first, required Hooker to conduct various field studies and surveys to determine the extent of chemical migration in the overburden and the Lockport Dolomite bedrock layers of the Landfill area. After accurate geological and hydrogeological data was obtained, Hooker was also required to provide a definite plan for remediation of the overburden and bedrock which would provide for the containment of the chemical waste as well as the monitoring and maintenance of this containment program. The parties agreed that compliance with this decree was to be measured in terms of a performance factor. A summary of some of the most important aspects of the Settlement Agreement can be found at 540 F.Supp. at 1074–76.

Further, all parties agreed that both aspects of the Settlement Agreement were to be carried out under the observation and supervision of the governmental parties and the court. It was also understood that, when the proposed plan was ultimately accepted by the parties, Hooker would be required to execute it, again under the supervision of the appropriate federal and state agencies and the court.

As was made clear in this earlier agreement, it was agreed that Requisite Remedi-

---

which is comprised of silt, clay, silty clay till, and sand. Underneath the overburden are several layers of bedrock. Of these, the Lockport Dolomite layer is closest to the surface, followed by the Rochester Shale, the Irondequoit Reynales, and several other formations composed of sandstone and shale. *See especially*, Faust Affidavit, ¶¶ 25–35.

As was indicated above, the chemicals from the Landfill site have been migrating from the site in recent years, primarily in a northwest direction toward the Niagara River and Lake Ontario. Figures 2 and 7 of the RRT Stipulation illustrate the approximate extent of the chemical migration from the site in the overburden and bedrock, respectively. *See also* Faust Affidavit, ¶¶ 46–56, and Figures 10–11, 13–14.

In addition, at least since the summer of 1984, chemicals attributed to the Landfill have been detected in the groundwater seeps at the Niagara Gorge Face, creating a potential health hazard to human health and the environment there. *See also* Shifrin Affidavit ¶¶ 42–45.

4. As is stated in the Shifrin Affidavit, ¶ 30, chemicals leave the Landfill by: 1) dissolving in groundwater and then moving laterally through the Landfill or downward with infiltrating rainwater; or 2) by the outward flow of NAPL.

5. Since the commencement of this lawsuit, this court has also granted motions to intervene as *amici curiae* to the Ecumenical Task Force, Pollution Probe, and Operation-Clean Niagara.

al Technology [RRT] was to be a crucial component of an approved consent decree. 540 F.Supp. at 1077. Stated another way, the parties were directed to develop acceptable engineering and construction practices for the Landfill site in light of the nature of the endangerment to human health and the environment, the extent to which application of the remedial technology would reduce such endangerment, as well as the economic cost required to apply the possible remedial technology.

To this end, Hooker was ordered to submit 1) a study to determine what RRT was required, and 2) a statement of alternative technologies it had examined, as well as the company's reasons for disregarding them as RRT. It was agreed—and thereafter approved by this court—that once such determinations had been made, Hooker would apply these procedures, unless it was determined by this court that the technology was unnecessary or that it would be arbitrary and capricious to mandate Hooker to implement that technology.

This court is now requested by the parties to approve the proposed RRT Stipulation in this case. As the parties set out in their Joint Memorandum in Support of Order Approving Hyde Park Stipulation Concerning the Requisite Remedial Technology Program [Joint Memorandum] (Item 378) from 1982 to May 1984, Hooker performed various field surveys and other data-gathering to determine the extent of chemical migration from the Landfill and thereafter submitted an RRT Study to EPA and the State. EPA and the State responded to this proposal on September 5, 1984.

Thereafter, the parties began intensive negotiations on the appropriate remedial programs to be implemented in this case. During the course of these negotiations, EPA and the State continued to meet with and inform concerned members of the public about relevant issues through regularly scheduled public meetings. In addition, EPA and the State met specifically with certain citizen groups and arranged various meetings between these citizen groups and Hooker, and between the governments of Canada, the Province of Ontario and Hooker. *See* Item 364, Affidavit of Ann Goldweber; Item 363, Affidavits of Matthew J. Forcucci and William J. Walsh. During these same periods, EPA and the State informed the public of the status of negotiations and responded to public comments. *Id.*

The parties' negotiations proceeded under the supervision of the court through frequent status conferences. By order of this court, the period of negotiations was extended from January 4, 1985, to November 26, 1985, when a proposed Agreement and a proposed RRT Stipulation were lodged with this court (Item 350). In December, 1985, EPA filed its extensive Memorandum in Support, including affidavits and other documents explaining and supporting the remedial choices made in the RRT Stipulation. In summary, the RRT Stipulation requires Hooker to:

Implement a source control program, *i.e.,* install wells to remove NAPL from the historic landfill for destruction by incineration (section 2.0 of the RRT Stipulation);

Implement remedial measures to contain and collect APL and NAPL in the overburden, particularly by installation of a tile drain system (section 3.0 of the RRT Stipulation);

Implement a prototype bedrock NAPL Containment System. This system is to involve operation of purge and recirculation wells designed to contain further lateral migration of the NAPL plume (and any APL within this region) and to withdraw NAPL (section 4.0 of the RRT Stipulation);

Install purge wells at the Niagara Gorge Face to collect a substantial portion of the bedrock APL plume (outside the NAPL plume) (APL Plume Containment System, section 4.0). The parties agree that additional remedial action is to be required if the residual loading (pounds per day) of certain chemicals to the Niagara River exceed action levels specified in the RRT Stipulation (section 4.3, "APL Plume Flux Action Levels.") This pro-

gram also includes a TCDD bioaccumulation study (section 4.4.3.2 of the RRT Stipulation).

Perform additional surveys in the bedrock below the Lockport Dolomite in order to determine what additional loadings, if any, of chemicals attributable to Hyde Park may be entering the Niagara River and require additional remedial action, *inter alia,* if the sum of all chemicals from Hyde Park exceed the APL Plume Flux Action Levels (sections 5.0 and 6.0 of RRT Stipulation);

Perform a series of remedial activities along the Niagara Gorge Face to protect human health and the environment (section 7.0 of the RRT Stipulation);

Implement a Community Monitoring Program designed to provide early warning in the event that chemicals from the Landfill migrate near the homes of local residents (section 8.0 of the RRT Stipulation);

Incinerate all NAPL collected by remedial systems and carbon treat all APL collected by the remedial systems (section 11.0 of the RRT Stipulation).

Further, the RRT Stipulation required OCC to implement its various remedies pursuant to a health and safety plan designed by the parties to protect local residents and the workers performing the remedial work. *See* section 12.0 of the RRT Stipulation. Moreover, section 10.0 of the RRT Stipula-

tion provides that all provisions of the RRT Stipulation may be reassessed based upon receipt of new information or changes in regulatory requirements. These various programs will be discussed at greater length below.[6]

After the RRT Stipulation was filed with this court, EPA and the State held three sets of public meeting and other public availability sessions to inform and solicit public comments.[7] In addition, the parties agreed that there would be a 45–day public comment period following the RRT filing which would automatically be extended to 60 days at the request of the public. At the parties' request, this court extended this public comment period to 90 days for sections 1.0 through 11.00 of the RRT Stipulation. *See* Item 351.[8] Thereafter, the EPA and the State responded to each of the numerous public comments that were received (Items 367—367(5); 368—368(3)) and agreed to modify the RRT Stipulation based upon these comments. *See* Items 372 and 374 (letters to Judge John T. Curtin). Additional affidavits and other supporting documents were also filed with this court in conjunction with these modifications. *See* Items 374–76.

The EPA, the State, and OCC now submit that, after careful review of this now-voluminous record, this court should expeditiously approve the present RRT Stipula-

---

**6.** Hereinafter, all specific aspects of the RRT Stipulation shall be referred to by section and by page, if it is deemed appropriate.

**7.** State Attorney Goldweber noted at the May 30, 1986, hearing that, although the Stipulation on RRT was not filed until November 25, 1985, the public participation process was actually begun in September, 1984, in this case. During the period of September, 1984, through November, 1985, the governments also had a series of public and private meetings with various individuals, including a number of the intervenors in this case. As has been noted in various of this court's orders, many of the programs which eventually became part of the present proposed RRT have been discussed with interested parties in a general way since 1984. In virtually every case, therefore, the present Stipulation represents only a refinement or "filling-out" of a plan which has been known to the public for a considerable period of time.

Further, the governments point out that, throughout the negotiation process, the State has made available to the public all of the documents that were exchanged between Hooker and the governments during the negotiation process. In September of 1985, all of the documents generated through June of 1985 were made available. In May of 1986, the remainder of the documents were produced.

In addition to the public meetings about the overburden remedies, bedrock remedies and the health and safety programs, interested persons were also given an opportunity to meet with the government's technical experts since the filing of the Stipulation in November of 1985.

**8.** A subsequent motion by plaintiff-intervenor College Heights Property Owners Association to further extend the public comment period (Item 359) was denied by this court (Items 366 and 370).

tion. They contend that significant delay in the approval process will jeopardize the timely construction of the permanent leachate storage and handling facility for toxic NAPL (which contains a vast majority of the TCDD), as well as delay the commencement of construction of certain other remedial systems beyond the 1987 construction season such that human health and the environment will not be properly protected. *See* Item 365, Affidavit of John R. Nichter.

As this court and other courts have previously noted, there is a judicial preference for the negotiated settlement of complex litigation of this type. *United States v. Hooker Chemicals & Plastics Corp.*, 540 F.Supp. 1067, 1072 (W.D.N.Y.1982). The court has only limited powers of review and should not

> substitute its judgment for that of the parties to the decree but [should] assure itself that the terms of the decree are fair and adequate and are not unlawful, unreasonable, or against public policy.

*Id.* As was stated in the Second Circuit case of *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir.1974), the court must "eschew any rubber stamp approval in favor of an independent evaluation" but "stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." *Id.* at 462. The reviewing court must consider a number of relevant factors including, most importantly, the strength of the plaintiff's case, but also the good faith efforts at negotiation, opinion of counsel, the risks involved in litigation were the settlement not approved, as well as the public interest and the intent of Congress in enacting the applicable and relevant environmental laws. In attempting to do the above, this court must also be mindful that the approval of the federal and state agencies charged with implementing environmental protection statutes "carries with it a strong presumption of validity." *United States v. Hooker Chemicals & Plastics Corp., su-*

*pra* at 1080. *See generally* Item 368, 1–8 to 1–10.

Several of the most important aspects of the proposed RRT program were explained and discussed at some length at the May 30, 1986, hearing before this court. As was made very clear at that time, the remedial program outlined in the RRT Stipulation should be viewed *as a whole;* No one system is, or can be construed to be, complete in itself. In other words, in the opinion of all of the parties involved, it is only when all of the RRT systems are operating effeciently and effectively together that human health and the environment can be considered adequately protected and the program accurately deemed to be "requisite" within the meaning of the Settlement Agreement.

As Mr. George Shanahan of the EPA's Region 2 office pointed out, section 2.0 of the RRT Stipulation involves source control—that is, it is designed to reduce the amount of NAPL chemicals migrating downward from the historic Landfill to prevent migration into deeper bedrock formations. As was outlined in the government's Exhibit 9 at the May 30 hearing, this source control plan itself has several aspects. Most importantly, the parties have agreed on the installation of two prototype extraction wells into the overburden in areas where the most significant amounts of NAPL have been detected. *See* government's Exhibit 10; section 2.2(A), pp. 15–16. Based on the information gathered from these two wells, it is planned that an operational system of some six wells will eventually be used to gather NAPL, absent new evidence which would indicate that an alternative course would be more appropriate. Section 2.2(B); *see also* Faust Affidavit, ¶¶ 69–71. As with all aspects of the proposed RRT programs, there is considerable flexibility built into the source control program so that the feasibility of other remedies can and will be reconsidered in the face of new evidence and advancing technology. Section 2.2(C) [9]

---

**9.** In the United States' Memorandum in Support of Proposed Stipulation on Requisite Remedial

Technology Program, they note that other alternatives—comprehensive excavation, lateral

The proposed RRT program also provides for certain overburden remedies to deal with contamination in the soil over the bedrock at the Landfill site. Section 3.0, *et seq.* As State Attorney Ann Goldweber summarized at the May 30, 1986, hearing, there are three aspects to these remedies: 1) the overburden barrier collection system; 2) the industrial protection program; and 3) the community-monitoring program. The general purpose of these proposed remedies is to contain the migration of the Landfill chemicals while, at the same time, effectuating a process to collect them and remove them from the ground.

More specifically, the objectives of the overburden barrier collection system are to contain the lateral spread of the APL and NAPL plumes and to maximize the collection of mobile NAPL that is within the plume. Faust Affidavit, ¶¶ 72–74.

The parties' proposed overburden barrier collection system consists of what is essentially the drain or a trench set around and just outside the parameters of the mobile NAPL plume. *See* sections 3.4–3.7.[10] The parties have agreed to place perforated piping at the bottom of this trench which is designed to collect and bring the contaminants to a pump chamber and, ultimately, to storage and treatment facilities at the

Landfill itself. *See* Government's Exhibit 12.[11]

Further, the parties have agreed to install a synthetic cap—in addition to the clay cap presently in place—to retard the infiltration and percolation of rainwater and snow melt at the Landfill site. This measure is designed to prevent further downward migration of chemicals into the bedrock formations. Section 11.5. Again, the overburden barrier collection system aspect of the proposed RRT program contains a mechanism for alternative measures if such are found to be more appropriate.

The industrial protection aspect of the proposed overburden remedies is designed to insure the health and safety of industrial workers in the Landfill area by eliminating any potential points of exposure to Landfill chemicals. Section 3.8, pp. 36–39.

Finally, the RRT overburden remedies provide for a residential community monitoring program. Section 8.0, pp. 123–40. This system provides for the placement of eight monitoring well pairs to measure chemical contamination in the overburden and bedrock. The measurements taken at these wells are designed to serve as an "early warning" so that preventive and remedial measures can be taken to avert any danger to human health and the environment, in the event that such becomes apparent.[12]

---

drains, grouting—were evaluated during negotiations and were deemed not appropriate at this time (Item 357, pp.16–24; section 2.3).

10. The RRT Stipulation requires that an overburden plume survey be done to define the lateral and vertical parameters of the APL and NAPL plumes in the overburden (sections 3.3.1 and 3.3.2).

11. *See* Sections 3.2, 3.4. The RRT Stipulation also makes explicit the parties' commitment to 1) remediate any "hot spots" not addressed by the tile drain system, and 2) monitor the overall performance of the overburden barrier collection system. In addition, at the hearing, attorney Goldweber informed the court that the already-existing drain system would continue to operate in the future.

12. Note that the parties are of the opinion that there is no present residential exposure to the Landfill chemical plumes in the bedrock and the overburden and that such exposure is un-

likely in the immediate future. Faust Affidavit, ¶¶ 106, 113; Shifrin Affidavit, ¶¶ 62–65; Item 356, Affidavit of Dr. Brian L. Murphy [Murphy Affidavit], ¶¶ 14, 60–65. However, the Residential Community Monitoring Program would monitor for any APL plume migration toward residential areas. The parties contend that this course is appropriate because the APL plume, due to its chemical nature, migrates at a much more rapid rate than the NAPL plume.

Intervenor CHPOA takes issue with the effectiveness of this program. *See* Item 389, ¶¶ 17–18 of attached Exhibits A, ¶¶ 4–5 (Affidavit of Dr. Irwin D. Bross); Exhibit C (Report of William Meyers). CHPOA argues that the record before the court does not provide a sufficient factual basis for the location and number of monitoring wells in the system. In addition, CHPOA argues that a proper "early warning" system would, *inter alia,* keep track of the APL and NAPL plumes in the overburden and bedrock before they reach the residential area and exposure occurs. The group contends that be-

The parties' proposed RRT Stipulation also has an aspect which deals with contamination in the Lockport Dolomite bedrock. Section 4.0, pp. 40–98; *see also* Government's Exhibit 7. According to expert opinion, the NAPL plume within this portion of the bedrock contains over 99 percent of the chemicals in the bedrock. *See, infra,* p. 21. In order to deal with this serious contamination, the parties have developed and proposed a NAPL plume containment system (sections 4.2.1 and 4.3) to 1) contain the further outward migration of chemicals from the NAPL plume; 2) contain the APL plume within this NAPL plume; and 3) maximize the collection of mobile NAPL within this area. This approval is designed, as a practical matter, to contribute to the elimination of seepage of chemicals at the Gorge Face (section 4.1; Faust Affidavit, ¶ 87). The parties plan to effectuate these goals first by defining the parameters of the NAPL plume (section 4.3.1.1) and then by implementing a prototype system involving a number of purge wells, cluster monitoring wells, and recirculation wells.[13] The proposed RRT Stipulation provides that additional wells can be added in the future if and when it is determined to be appropriate. *See* Government's Exhibit 14; Faust Affidavit, ¶ 84. Further, the RRT provides that a series of various monitoring wells be placed in the ground to measure contamination in the Lockport Dolomite to assure that the Bedrock RRT is effective. *See* Government's Exhibit 15.[14]

The proposed RRT Stipulation also provides for a plan for containment of the APL plume outside the bedrock NAPL plume (sections 4.2.2 and 4.4). The plan seeks to 1) contain the APL in the most heavily contaminated area; 2) eliminate seepage along the gorge face; and 3) insure that the residual level of discharge will not endanger human health or the environment.

In order to accomplish these goals, the parties have devised three general programs. First, two to three purge wells are planned to be installed in the area of the so-called "remediated" bedrock APL plume in an attempt to halt seepage in the northwest portion of the contaminated area (section 4.4.1.1)[15]. The RRT also provides for the use of a "Flux Monitoring System" to assure that, in the event that a certain level of chemical "loading" occurs (*i.e.*, "flux" or discharge of contaminants into the Niagara River), additional remedial remedies would

cause the parties cannot conclusively state that the residents will not be exposed to chemical contaminants, the RRT program should include a relocation program for threatened persons. This court finds these arguments unpersuasive. The record in this case indicates that remedial action would be triggered by the Community Monitoring Program before the public could be exposed to levels creating health concerns. *See* Item 350, pp. 30–31 and accompanying footnotes.

13. *See* sections 4.3.2, 4.3.6.1, and 4.3.4. CHPOA objects to the reinjection of APL–ized groundwater back into the ground through the recirculation wells. The parties have responded to this criticism by stating that this APL is to be used primarily to force NAPL toward the purge wells for collection and destruction. *See* Transcript of May 30, 1986, hearing, pp. 196–97. They say the cost of treatment would be significantly increased by the injection of clean water with little additional health and environmental benefit.

14. The system is to be monitored by three independent means to ensure that the chemicals in the NAPL plume are contained and collected.

The system will be monitored hydraulically, chemically, and by visual and olfactory means. *See* section 4.3.7.3. If these monitoring methods reveal that the NAPL Plume Containment System is not functioning effectively, additional measures must be taken. *See* sections 4.3.8.1 and 4.3.8.2.

As is noted in the EPA's Memorandum in Support of the RRT Stipulation, the NAPL Plume Containment System is designed to contain 100 percent of the NAPL plume so that none of these chemicals will enter the Niagara River (Item 357, page 38).

15. As is noted on page 21, *infra,* this area contains approximately 60 to 88 percent of the chemicals in the total APL plume that is beyond the reach of the NAPL Plume Containment System. The APL Plume Containment System is designed to reduce "discharge"—and, therefore, the risk—from the Remediated APL Plume be 80 percent. Section 4.4.1.1 provides that seepage of the Gorge Face must not exceed 15 gallons per minute.

be required to be put into action. *See* Government's Exhibits 16–18.[16]

The proposed RRT Stipulation also contains a provision for an intermediate formation study (section 5.0, pp. 99–107) and for a deep formation study in the event the intermediate formations are found to be contaminated (section 6.0, pp. 108–16).[17] Finally, section 7.0 of the proposed RRT prescribes a program of identification and remediation to halt seepage along the gorge face (section 7.0, pp. 117–22).[18]

All of the parties agree that the above-outlined RRT programs are to be carried out in connection with the Environmental Health and Safety Plan set out in section 12.0 of the RRT Stipulation pp. 161–207.[19] This program is designed to protect the workers who are actually to implement the above remedies and also, importantly, those persons who live and work in the vicinity of the Landfill.

After careful consideration of the entire record in this case, and in light of the standard of review articulated above, I believe that the proposed RRT Stipulation must now be approved by this court. I cannot say, as the opponents of the RRT contend, that the RRT represents an arbitrary and capricious agreement. Instead, I believe that the Stipulation reflects the good faith efforts of all parties concerned to address the serious potential health hazards posed by the Hyde Park Landfill.

It is, I believe, also important to reiterate that the RRT Stipulation, approved today, is a very flexible program. As was stated above, and is noted throughout the text of the Stipulation itself, the RRT Stipulation provides for the reassessment of various provisions in light of changing scientific expertise, technology, and data about the effectiveness of the program remedies. This feature is crucial, because it allows for remediation to be begun immediately and avoids further expenditure of considerable time, money, and effort in litigation, without any guarantee that the program ultimately will be more effective than the one presently agreed to by all the parties.

Therefore, while the present RRT program may not, in fact, solve all of the many problems at the Landfill site, this court believes that, given the present state of science and technology in the area of toxic waste disposal and management, the

---

**16.** Based upon all available information (*see generally* Shifrin Affidavit, Rodricks Affidavit, Benavides Affidavit), the governments determined that it was prudent to control residual discharges of TCDD, PCBs, Mirex, and chloroform for the Hyde Park Landfill—*after* installation of the bedrock APL Plume Containment System—by establishing Flux Action Levels. The APL Plume Flux Action Parameters, Flux Action Levels, and Interim Flux Action Level for TCDD play a crucial part in determining whether additional remediation would be required in the future in order to adequately protect human health and environment. *See* sections 4.4.2—4.-4.6.

Note, in addition, that section 10.0 of the RRT Stipulation allows for reassessment of the Flux Action Levels if the circumstances of this case warrant it.

**17.** These remedies are intended to measure the vertical migration of the contaminants and, if necessary, to require remedial action to prevent chemicals from entering the Niagara River in excess of Flux Action Levels.

**18.** EPA's expert hydrogeologist believes that the proposed APL Plume Containment System, in conjunction with the NAPL Plume Containment System, will virtually dry up the flowing seeps containing Landfill chemicals. Faust Affidavit, ¶¶ 87, 89–90. However, section 7.0 and Appendix A require additional precautionary measures. In general, these portions of the RRT Stipulation require Hooker to divert many of the contaminated seeps in order to minimize exposure to fishermen, other recreational users of the Gorge Face, and Power Authority of the State of New York [PASNY] employees.

In addition, except for the Bloody Run drainage area, the soil beneath the flowing seeps and wet areas will be sampled for Soil Survey Parameters and Gorge Face Soil/Sediment Action Parameters (*see* Item 357, Table 6) and various remedial courses are possible depending on the findings. *See especially* sections 7.3 and 7.5. In the Bloody Run drainage area, a different course is to be followed. *See generally*, RRT Stipulation, Appendix A.

**19.** The Health and Safety Plan requires three types of monitoring: 1) organic vapor monitoring in the immediate area where work was being performed; 2) monitoring of organic vapors and chemicals on particulates at the parameter of the Landfill; and 3) monitoring of chemicals on particulates in the community.

present RRT program represents a very positive step toward cleaning up the Landfill and maintaining a safe environment in Western New York and Southern Ontario.

Having just approved the parties' RRT Stipulation, this court believes that, because two separate issues have received particular attention from the public-at-large, these issues warrant more extended discussion at this time. These issues involve two major contentions: 1) that the Landfill should be excavated and incinerated so that the problem posed by a "continuing source" of contamination can be eliminated; 2) that no RRT agreement that permits any residual discharge of Landfill chemicals into the Niagara River can properly be deemed acceptable.[20]

These issues have been previously litigated before this court in the original Hyde Park evidentiary hearing and the evidentiary hearing held in connection with this court's approval of the settlement agreement in the S–Area case. *Cf., United States v. Hooker Chemicals & Plastics Corp.,* 607 F.Supp. 1052, 1067–70 (W.D. N.Y. 1982), *aff'd,* 776 F.2d 410 (2d Cir. 1985).

In this court's 1982 decision, it was noted that there was nothing in the record to indicate that excavation of the Landfill site was requisite. 540 F.Supp. at 1078–79. My review of the record at this time indicates that this is still the case. Although the present RRT program is essentially one premised on the notion of containment and collection of the Landfill contaminants, the record indicates that the problems inherent

in such a program would not be solved by a plan of excavation.

Any attempt at excavation at the Landfill site would necessarily involve removing 200 million pounds of soil, not including the outlying NAPL plume and overburden and bedrock (Item 368 at 2–3 to 2–4). In addition to the high cost of such excavation and the subsequent problems of incineration/landfilling disposal of the contaminated earth,[21] the record shows that excavation would pose substantial and serious health risks which would not be involved in a plan of containment. More specifically, excavation of the Landfill site would generate unacceptable levels of contaminated dust, dirt, and vapors in the excavation area, causing a potential hazard to area residents and workers. Furthermore, any excavation of the Landfill site would necessarily require a removal of the clay cap currently in place at the Landfill which would increase the flow of NAPL and APL in the bedrock and the overburden during remediation.

Importantly, the record indicates that any excavation of the Landfill site would not, by itself, remedy the fact that there are tons of NAPL in the bedrock which would still have to be prevented from leaching from the site and eventually discharging into the Niagara River. In addition, there would still be an APL and NAPL plume in the overburden outside the parameters of the historical Landfill. Therefore, even if excavation were found to be requisite in the context of this case, all of the remedies discussed above—with

**20.** Intervenor College Heights Property Owners Association [CHPOA] argue that the RRT program is unsatisfactory for 16 specific reasons (Item 389). Most importantly, Lewis Steele, attorney for the CHPOA, argued during the May 30, 1986, hearing that the burden in this case is clearly on the parties to set down and explain each and every one of these changes and explain why these are necessary and "requisite" in the context of this case. CHPOA says that the parties have failed to do so and to indicate why a quicker and more inclusive program is not more appropriate.

More specifically, CHPOA argue that the acceptable level of APL discharges in the RRT Stipulation should properly be reduced, that the

methodology employed by the parties to set forth the potential adverse health impacts from the Landfill and the proposed remedial actions are neither adequate nor accurate, and that program will not provide the degree of protection asserted by the proponents of the agreement. *See* Item 389, Exhs. A and B (Affidavits of Dr. Irwin D. Bross).

Further, CHPOA argues that the RRT program should not hinge on the ability of Hooker to properly permit its incinerator and that such reliance improperly delays the commencement of many remedial measures unnecessarily.

**21.** Item 368, 2–2 to 2–43.

**1312**

the exception of source control—would have to be implemented in order to make the RRT program a workable one. *Id.*

As a result of these and other factors, the parties in this case have opted for a program of containment and collection of the Landfill contaminants. In addition, the parties have entered into a memorandum of understanding that incineration or its performance equivalent be used for destruction of the collected NAPL (Item 348). There is presently an investigation underway to determine whether or not the Hooker incinerator at its plant site in Niagara Falls, New York, can meet the applicable regulatory requirements for incineration, given the absence of other, government-approved disposal methods.[22] As EPA attorney William Walsh made clear at the May 30, 1986, hearing, it is crucial that this disposal issue be resolved in the near future because, in its absence, none of the proposed remedies described above can be implemented.

A second major issue raised by commentators concerned the adequacy of the APL Plume Flux Action Levels used in the RRT Stipulation because they do not require that there be absolutely no discharge of chemicals into the Niagara River. Item 368 at 2–2, 3–2; *see also* Item 368(1), Attachments 4 and 5 (copies of all public comments). As was explained above, the RRT Stipulation requires Hooker to stop the migration of NAPL and, in fact, withdraw NAPL from the bedrock so that it can be destroyed through incineration (*see* sections 4.3 and 11.7). This system, in conjunction with above-described overburden remedies (section 2.0) and the tile drain around the Landfill (section 3.0) are designed to collect approximately 99 percent of the chemicals leaving the site, including the entire bedrock NAPL plume. Item 368, at 3–12; *see also* Footnote 14, *supra*.

Another set of remedies (section 4.4 of the Stipulation) is designed to collect most (80 percent) of the remaining 1 percent of the bedrock groundwater within the APL plume—*i.e.*, the bedrock groundwater plume outside the NAPL plume. *See* Shifrin Affidavit, ¶¶ 39, 70–78; Faust Affidavit, ¶¶ 86–91; *see also* Footnote 15, *supra*. Since some remaining portion of the APL plume will, under the present RRT program, continue to enter the Niagara River, the Stipulation requires OCC to quantify this "loading" and to take additional remedial action if the measured discharges exceed the loadings specified in the RRT as APL Plume Flux Action Levels (section 9.3).

While it is true that these APL Plume Flux Action Levels do not mandate that there be zero discharge of contaminants into the Niagara River, the parties have demonstrated to this court that more stringent requirements are neither feasible nor requisite given the facts of this case. *See* Item 368, section 3.[23]

22. *See* the parties' July 28, 1986, proposed "Stipulation and Order on Procedures Concerning Incineration of Hyde Park NAPL." *Note also* that the parties have preserved the right to reexamine this remedy in the future if the containment and collection systems are not effective. *See e.g.*, 2.2(c)(6), 2.2(c)(2,3,4).

23. In all cases, it was concluded that Flux Action Levels limit the flux of toxic chemicals for the Hyde Park Landfill such that: 1) numerical water quality standards, health advisories, and other environmental criteria would not be violated from this source alone, and 2) the residual discharge of chemicals from the Hyde Park Landfill would not significantly contribute to any existing quality problem such that it would be requisite to require further remedial action at this time. *See* Item 353, Affidavit of Dr.

Joseph V. Rodricks, [Rodricks Affidavit] ¶¶ 21, 24, 25, 27, 263; Item 368, Table 18 at 3–69.

In the case of dioxin, the parties state that, although it is estimated that the containment level associated with residual flux at the Interim Action Level is lower than applicable numerical water quality standards, health advisories, and other environmental criteria, it is acknowledged that there is uncertainty concerning the extent to which dioxin will accumulate in edible fish tissue. *See* Item 354, Affidavit of Livia M. Benavides; Shifrin Affidavit, ¶ 78; Rodricks Affidavit, ¶¶ 223–29, *particularly* Table XVIII. As a result, the Stipulation specifies an Interim APL Plume Flux Action Level (section 4.4.3.2.) which reflects some of these uncertainties. *See also* section 4.4.3.3. In addition, the parties point out that the RRT has the flexibility to adjust action level if new data became available and the circumstances warrant adjustment.

This court is mindful that much remains to be done at the Landfill. The Stipulation and Decree require continuing study, observation, and control to the greatest extent possible so that any chemical exposure can be minimized. Moreover, this court notes that intervenor CHPOA has argued throughout the history of this case that the RRT Stipulation could have been more extensive and/or protective. While I agree that a more protective RRT Stipulation might have been possible here, given the standard of review discussed above, the proposed RRT Stipulation must now be approved by this court.

As stated above, the RRT programs described in this decision were approved by all of the parties—including the federal and state governments—followed an extended series of settlement negotiations. Its provisions, taken as a whole, make up a multifaceted and comprehensive plan which allows for 1) immediate commencement of remedial activity at the Landfill site; and 2) the flexibility to adjust to the changing circumstances of this case. If it is shown that the RRT Stipulation's various programs do not, in fact, adequately meet the protective standards agreed to by the parties, the parties have reserved the right to modify the programs to bring them into conformance with these standards. *See* section 10.0. And as was made clear in this court's 1982 decision, all of the RRT programs are to be carried out under the supervision of the federal and state plaintiffs and, ultimately, the supervision of the court so that protection of human health and the environment can be assured. 540 F.Supp. at 1078.

I believe that this course is a prudent and, indeed, realistic one. I also find persuasive the fact that the RRT programs can be implemented within a time frame which will prevent the further contamination of the surrounding area, as well as the expenditure of considerable time, money, and effort in litigation.

This court believes that the RRT Stipulation is a good one and reflects the arms-length bargaining of all parties involved. Because I believe that it provides sound protection to human health and the environment on the Niagara Frontier, I find that the RRT Stipulation is satisfactory and shall be approved.

So ordered.