**UNITED STATES of America, et al., Plaintiffs,**

v.

**HOOKER CHEMICALS & PLASTICS CORPORATION, et al., Defendants.**

**CIV–79–989C.**

United States District Court, W.D. New York.

Aug. 18, 1987.

---

5. See, for example, the comments of George McKean in note 4, *supra.*

U.S. Dept. of Justice, Environmental Enforcement Section, Land and Natural Resources Div., (George Shanahan, of counsel), Washington, D.C., for plaintiff U.S.

Robert Abrams, Atty. Gen., of the State of N.Y. (Ann Goldweber, Asst. New York State Atty. Gen., of counsel), New York City, for plaintiff State of N.Y.

Piper & Marbury (Keith S. Watson, of counsel), Washington, D.C., for defendant Hooker Chemicals & Plastics Corp.

Robert Paul Merino, Niagara Falls, N.Y., for defendant Town of Niagara.

Lewis Steele, Buffalo, N.Y., for plaintiff-intervenor College Heights Property Owners Ass'n.

CURTIN, Chief Judge.

By my short Supplemental Order # 27, issued by this court on July 23, 1987 (Item 421), I ordered the Town of Niagara [Niagara] to issue all necessary authorizations and permits to Occidental Chemical Corporation [OCC] for the construction and operation of the proposed permanent leachate storage and handling facility [PLSH facility] at the Hyde Park Landfill on or before August 18, 1987. At the time this order was issued, I stated that I would soon file a more detailed discussion of my finding that Niagara had violated its duty pursuant to the 1981 Settlement Agreement and the 1985 Requisite Remedial Technology Stipulation to use its "best efforts" to obtain these authorizations and permits. This order will contain this more detailed explanation.

The United States, the State of New York [EPA/State], and OCC all make essentially the same arguments in their papers. *See* Items 410, 411, 412, 415, and 418. As was stated in my Supplemental Order # 27, Niagara was a party to a court-approved 1981 Settlement Agreement [Settlement Agreement] to investigate and remediate the contamination in and about the Hyde Park Landfill and the Bloody Run drainage area. *United States v. Hooker Chemicals & Plastics Corp.*, 540 F.Supp. 1067 (W.D.N.Y.1982). Paragraph 8(d)(1) of this agreement required the governmental parties to "use their best efforts consistent with their legal authority" to help OCC obtain on a timely basis all permits, easements, rights of way, approvals, or other authorizations necessary for the company to carry out its obligations pursuant to settlement. The parties' Stipulation on Requisite Remedial Technology [RRT Stipulation], approved by this court in 1986, *United States v. Hooker Chemicals & Plastics Corp.*, 641 F.Supp. 1303 (W.D.N.Y. 1986), detailed a plan for remediation of the Hyde Park Landfill site which included a requirement that OCC construct facilities adjacent to the landfill sufficient for the storage and on-site treatment of collected aqueous phase liquids [APL] (RRT Stipulation, section 11.5) and temporary storage of all collected non-aqueous phase liquids [NAPL] (RRT Stipulation, section 11.7).

As is set out in OCC's papers, in 1986, OCC and EPA/State reached agreement concerning the location and conceptual design of a permanent facility to store APL and NAPL leachate and to treat APL. The PLSH facility will be located on the western perimeter of the landfill on a tract of land zoned "heavy industrial" and formerly used by a heating oil distributor and a service station. This property is bounded

on the west by Hyde Park Boulevard, on the north by unoccupied land owned by the Power Authority of the State of New York [PASNY], on the east by the Hyde Park Landfill, and on the south by commercial property owned by the Niagara Monument Works [NMW].

The planned facility includes two storage tanks having a capacity of 158,000 gallons (30 feet in diameter; 32 feet high), a building containing an APL carbon treatment system, and attendant decanting, loading, and office facilities. Item 411, Affidavit of John R. Nichter [Nichter Affidavit], ¶ 10. This facility is part of a "closed" system. As the Nichter Affidavit makes plain, APL and NAPL leachate from the RRT systems will be pumped by pipe to a decanter at the facility where the leachate will separate into APL and NAPL phases. The APL will thereafter be pumped to the treatment system, and the NAPL will be pumped to the storage tanks pending off-site transportation and incineration. Nichter Affidavit, ¶ 12. Trucks to transport NAPL will enter from Hyde Park Boulevard, receive NAPL at the loading facility, and exit to the north via New Road. Nichter Affidavit ¶ 12 and Exhibit 1.

As all parties acknowledge, OCC cannot install and operate the Hyde Park remedial systems and begin the process of removing the approximately 80,000 tons of chemical wastes at the site unless and until the PLSH facility is constructed. Moreover, this construction cannot begin unless and until Niagara issues all necessary authorizations and permits.

The history of OCC's efforts to obtain the required permits and authorizations makes clear that Niagara has not used its "best efforts" to aid the company in this regard, as is required by section 8(d)(1) of the parties' Settlement Agreement. Accordingly, by the authority vested in this court to enforce its judgments,[1] I now direct that Niagara issue all required authorizations and permits to OCC on or before August 18, 1987, and to otherwise act in accordance with this court's various orders in this case. As I stated in Supplemental Order # 27, by that date, EPA/State, OCC, and Niagara are directed to submit filings to this court indicating the status of this matter.

Paragraphs 18–33 of the Nichter Affidavit explain in some detail the company's substantial efforts to obtain zoning and other authorizations required by the Town of Niagara to construct and operate the proposed PLSH facility. Mr. Nichter states that in an April 1985 letter to Niagara, OCC provided notice of its plans to build a PLSH facility at the Hyde Park Landfill site. Thereafter, in November of 1985, the parties' RRT Stipulation, which included plans for the PLSH facility, was lodged with the court for review. Despite specific invitations to do so, the record of this case shows that Niagara did not submit comments while the RRT Stipulation was under review by this court, nor appear at any proceedings convened by the court during this time. As I stated above, the RRT Stipulation was ultimately approved by this court in August of 1986. *But see* Nichter Affidavit, Exh. 2.

On November 26, 1986, OCC submitted its formal application to Niagara seeking the site plan review, zoning permit and other authorizations required to construct and operate the PLSH facility. *See* Nichter Affidavit, Exh. 3. Following a meeting with Niagara Building Inspector John Walsh on February 3, 1987, during which Mr. Nichter attempted to respond to all questions and comments raised in a January 27, 1987, letter of Niagara's Attorney Robert Merino (Nichter Affidavit, Exh. 4), OCC supplemented its filing to provide certain information requested by Mr. Walsh. Nichter Affidavit, Exh. 5. Thereafter, neither Mr. Walsh nor any other Niagara official requested that OCC submit any additional material.

On the evening of February 3, 1987, Mr. Nichter also attended a meeting of Niagara's Town Environmental Commission

---

**1.** *See* Settlement Agreement, ¶¶ 8(d)(1), (d)(2); Addendum I, ¶ E.9(c). *See also* All Writs Act, 28 U.S.C. 1651(a); *United States v. New York Telephone,* 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977).

which was considering OCC's application. At this meeting, Mr. Nichter apparently responded to several questions about the PLSH facility but was not requested to provide any further information.

On February 18, 1987, this court met with Niagara's attorney, Robert Merino, as well as representatives from EPA/State and OCC to discuss the status of the OCC application. At that time, Mr. Merino indicated that the Town Board, acting as a Planning Board, would consider the OCC application at a meeting on March 10, 1987. However, the Town Board did not, in fact, address the merits of the application on that date but merely directed OCC to the Town Zoning Board of Appeals to apply for certain zoning variances. OCC was also told to contact the Niagara County Planning Board at that time.

The following day, OCC made submissions to the Zoning Board of Appeals to obtain variances relating to the side and rear set-backs provided in the applicable zoning ordinance. At or about the same time, the company also made submissions describing the project to the Niagara County Planning Board. After the Planning Board met on March 16, 1987, it referred the matter to the Town Board for final action. On March 25, 1987, the Zoning Board of Appeals held a public hearing to discuss the OCC application for a variance. This application was approved. Nichter Affidavit, Exh. 7.

Finally, on April 13–14, 1987, the Town of Niagara Board met as a Planning Board to discuss the OCC application. During these sessions, the Board and representatives of EPA/State and OCC discussed the question of incineration and OCC's efforts to secure certain necessary easements. After meeting in private, the Board voted to unanimously to reject OCC's site plan and zoning permit. Nichter Affidavit, Exh. 8. Thereafter, on April 20, 1987, the Board issued a letter decision which listed 10 reasons for their denial. Nichter Affidavit, Exh. 9.

The EPA/State and OCC argue that the reasons set forth in the Town Board's April 20, 987, letter show that Niagara was not using its "best efforts" to obtain all necessary permits and authorizations to construct and operate the PLSH facility at the Hyde Park Landfill. For the reasons set out below, I find this argument persuasive, and therefore direct Niagara to issue all necessary permits and authorizations to OCC.

As OCC notes in its memorandum in support of plaintiff's petition to require issuance of the Niagara permits and authorizations, the reasons for Niagara's denial can be put into essentially three groups: 1) the absence of private authorizations required to construct certain access roads; 2) issues relating to long-term plans, including possible off-site treatment of APL; and 3) miscellaneous considerations, such as aesthetics and the applicability of the State Environmental Quality Review Act [SEQR]. A review of these stated reasons make clear to this court that Niagara did not use its "best efforts" in processing OCC's application.

Niagara's concern with the absence of formal agreements with PASNY and NMW for the use or purchase of adjacent property for access roads to the PLSH facility is reflected in its reasons numbered 1, 2, 7, and 8 of its April 20, 1987, letter (Nichter affidavit, Exh. 9). However, the Nichter Affidavit shows that Niagara was informed that an agreement in principle had been reached with PASNY and was also informed of the company's efforts relating to the NMW property. Nichter Affidavit, ¶ 34(a), (b), (g), and (h). Moreover, because OCC explicitly stated to the Board that it would accept authorizations from Niagara conditioned upon its ability to secure the easements and purchases it needed, I believe that the absence of executed agreements with PASNY and NMW provides no valid basis for denying the company's application.

Reasons 3, 5, and 6 of the Town Board's April 20, 1987, letter involve its concerns that OCC has not revealed its "long-term," "concrete" plans for the site and questions why APL cannot be treated off-site. On the latter issue, the RRT Stipulation requires on-site APL treatment and storage

because of the large volumes of APL which are expected to be generated by the various RRT programs. In the judgment of the experts of both OCC and EPA/State, to transport the more than 94,000 gallons of APL per day expected to an off-site location would require an unacceptable amount of truck traffic through the streets of the City of Niagara Falls and the Town of Niagara, and would also be environmentally inappropriate. In court on July 17, 1987, the company and EPA/State assured the court that the proposed PLSH facility will be able to accommodate all of the leachate expected to be generated during remediation such that no future expansion of the facility will be necessary in the future.

Moreover, OCC and EPA/State have made clear to Niagara that, although there is presently no incinerator permitted to accept Hyde Park NAPL, the parties are presently involved in a process to review OCC's application to destroy NAPL at its Buffalo Avenue Incinerator in the City of Niagara Falls. To obtain federal and state authorizations to do so, it has been agreed that OCC must successfully complete three "trial burns." Pursuant to this court's Supplemental Order #28, EPA/State is presently reviewing the trial burn data produced to date in order to decide whether or not the third NAPL trial burn may be allowed to proceed. *Cf.*, Item 394, Stipulation and Order on Procedures Concerning Incineration of Hyde Park NAPL [Incineration Stipulation]; Item 401, Revised Schedule, approved January 22, 1987.

Finally, during oral argument on July 17, 1987, this court and Niagara were assured by EPA/State and OCC that the proposed PLSH facility would be used solely for storage and treatment of Hyde Park APL and NAPL. According to these parties, there are presently no plans to use the facility for the treatment of any chemical materials other than the 80,000 tons of chemical wastes which are currently present in or migrating from the Hyde Park Landfill site. The parties also indicate that there are no plans to alter this course in the foreseeable future, or to expand the facility into adjacent properties.

Given all of the above, I find that Niagara's rejection of OCC's application because of questions about OCC's long-term plans for the facility does not evidence Niagara's "best efforts," as is required by section 8(d)(1) of the parties' Settlement Agreement. Indeed, it appears that Niagara's denial is no more than an "untimely, collateral and inappropriate challenge to the RRT Stipulation." Item 410, p. 16.

Finally, Niagara denied OCC's application on the basis of various questions about aesthetics, parking, routes of access for emergency vehicles, and the possible applicability of the SEQR Act. Nichter Affidavit, Exh. 9, Reasons 4, 9, and 10. These issues are all addressed in the Nichter Affidavit, paragraphs 25, 33, 34(d), (i), and (j), and are all insufficient to warrant Niagara's denial of the OCC application and the installation of the various Hyde Park remedial systems at this time.

As EPA/State and OCC make plain in their respective filings on the instant dispute, none of the important remedial programs described in the parties' court-approved Settlement Agreement and RRT Stipulation can be put into operation unless and until the proposed PLSH facility for the storage and treatment of Hyde Park Landfill leachate is constructed and put into operation. Accordingly, unless and until all parties—including Niagara—use their best efforts to assist in the construction of this facility, the 80,000 tons of chemical wastes from that landfill site will continue to migrate off-site and pose a potential threat to human health and the environment. Because I believe that Niagara has not used its best efforts to assist OCC to obtain the necessary permits and authorizations to construct and operate the PLSH facility, it has violated its obligation under section 8(d)(1) of the Settlement Agreement. Therefore, I now grant the petition of EPA/State and OCC for an order directing Niagara to issue all applicable authorizations and permits, and to otherwise act in accordance with this court's various orders in this case.

So ordered.